DRA:CMM/JMM:jmm
F. #2003R01009
warrants affidavit2.wpd

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

    - against -

NICHOLAS MICHAEL GRUTTADAURIA,
    also known as "Beaver"
    and "Nicky G,"
RONALD PECORARO,
    also known as "Ronald Russo"
    and "Frank Pecoraro,"
JOSEPH RUTIGLIANO,
    also known as "Joe Box," and
    "Joe New York,"
DAVID A. GROSS,
KIM BRADY LAND,
MUSTAFA KAHRAMAN,
    also known as "Mike,"
NEDIM SIRIN,
MEHMET SAP, also known as "Metim,"
MICHAEL COSTIGLIOLA,
JOHN CAVALLO, also known as "Jack,"
GIOVANNI VELLA,
    also known as "John Vella"
    and "Mousey,"
BIROL METE,
    also known as "Billy Boy,"
MECIT SAHIN,
    also known as "John,"
SALVATORE RUBINO and
SALVATORE CESARINO,

              Defendants.

- - - - - - - - - - - - - - -x

AFFIDAVIT IN SUPPORT OF
OF AN APPLICATION FOR
ARREST WARRANTS

(T. 18, U.S.C., §§ 371,
1512(b)(3), 1951(a)
and 1956(h))

# M 05-1109

EASTERN DISTRICT OF NEW YORK, SS:

    THOMAS R. HOLMES, Special Agent with the Federal Bureau
of Investigation (FBI), being duly sworn, states that, upon
information and belief, there is probable cause to believe that:

## Illegal Gambling Operation Conspiracy

In or about and between February 2003 and the date of the filing of this complaint, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants NICHOLAS MICHAEL GRUTTADAURIA, also known as "Beaver" and "Nicky G," RONALD PECORARO, also known as "Ronald Russo" and "Frank Pecoraro," JOSEPH RUTIGLIANO, also known as "Joe Box" and "Joe New York," MUSTAFA KAHRAMAN, also known as "Mike," NEDIM SIRIN, MEHMET SAP, also known as "Metim," BIROL METE, also known as "Billy Boy," MECIT SAHIN, also known as "John," MICHAEL COSTIGLIOLA, GIOVANNI VELLA, also known as "Mousey," JOHN CAVALLO, SALVATORE RUBINO and SALVATORE CESARINO, did knowingly and willfully conspire to conduct, finance, manage, supervise and direct all or part of an illegal gambling business, and one or more of such persons did acts to effect the objects of the conspiracy, in violation of Title 18, United States Code, Section 1955.

(Title 18, United States Code, Section 371)

## Extortion and Obstruction of Justice

In or about and between December 2003 and January 2004 both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants RONALD PECORARO, also known as "Ronald Russo" and "Frank Pecoraro," and JOSEPH RUTIGLIANO, also known as "Joe Box" and "Joe New York," knowingly and intentionally conspired to obstruct, delay and affect commerce

and the movement of articles and commodities in commerce by extortion and the use of threats of violence to persons and property; and hindered, delayed, prevented the communication to a law enforcement officer of the United States of information relating to the commission of a federal offense, namely, information relating to violations of Title 18, United States Code, Section 1955(a).

(Title 18, United States Code, Sections 1951(a) and 1512(b)(3))

## Money Laundering Conspiracy
### (Illegal Gambling Proceeds)

In or about and between February 2003 and the date of the filing of this complaint, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants NICHOLAS MICHAEL GRUTTADAURIA, also known as "Beaver" and "Nicky G," RONALD PECORARO, also known as "Ronald Russo" and "Frank Pecoraro," and JOSEPH RUTIGLIANO, also known as "Joe Box" and "Joe New York," together with others, knowingly and intentionally conspired to conduct and attempt to conduct financial transactions affecting interstate commerce, to wit: the transfer of United States currency, involving property used to conduct and facilitate specified unlawful activity, to wit: illegal gambling, knowing that such financial transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and

financial transactions affecting interstate commerce, to wit: the transfer of United States currency, involving property represented by a law enforcement officer to be the proceeds of and used to conduct and facilitate specified unlawful activity, to wit: possession, sale and disposition of stolen or fraudulently obtained merchandise in interstate commerce, with the intent to conceal and disguise the nature, location, source, ownership and control of such proceeds, in violation of Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Section 1956(h))

The source of your deponent's information and the grounds for his belief are as follows:[1]

## A. **Introduction**

1.  I have been a Special Agent of the FBI since May 2002, and am currently assigned to the organized crime squad of the Long Island Resident Agency of the FBI. As a Special Agent, I have participated in investigations into criminal activities of the various organized crime families of La Cosa Nostra, during which I have conducted or participated in physical and electronic surveillance, execution of search and arrest warrants, and debriefing of cooperating witnesses and informants who were members

---

[1] As this affidavit is submitted only to illustrate that probable cause exists to believe that the defendants committed certain crimes, all of the facts known to me as a result of my investigation have not been included. Whenever conversations are noted, they are set forth in substance and in part.

and associates of organized crime families.  I have also reviewed numerous taped conversations.

2.  Since 2003, I have personally participated in the investigation of the defendants named in this complaint.  My participation has included conducting physical surveillance, contemporaneous monitoring of and review of tape recordings of the consensual telephone calls, interviews with and analysis of reports submitted by Special Agents of the FBI and other law enforcement officers who have participated in the investigation, debriefing cooperating defendants previously associated with organized crime as well as other sources, and monitoring and review of wire communications intercepted pursuant to court orders authorizing the interception of wire communications over telephones used by GRUTTADAURIA, PECORARO, RUTIGLIANO and GROSS.  The facts alleged in this complaint are based on these sources.

**B.  Overview of the Investigation**

### 1. GRUTTADAURIA

3.  Confidential sources and FBI surveillance have indicated that GRUTTADAURIA has been an associate of the Genovese Organized Crime Family (the "Genovese crime family") of La Cosa Nostra ("LCN") since at least December 1985.  From his position with the Genovese crime family, GRUTTADAURIA has overseen the activities of PECORARO and RUTIGLIANO in illegal gambling.  A partnership among the three dates back to at least 1989, when

GRUTTADAURIA and PECORARO entered guilty pleas to wire fraud charges in the United States District Court for the District of Connecticut in connection with the operation of a "rigged" gambling establishment run by members of the New England-based Patriarca Organized Crime Family of LCN.[2]

4.   Based on evidence I have reviewed, I believe that GRUTTADAURIA is a made member, or soldier, of the Genovese crime family and is treated as such by his peers.   For example, on December 13, 2003, pursuant to Court-authorized electronic surveillance PECORARO was intercepted stating that GRUTTADAURIA[3] had gotten his "button," an expression meaning he had been inducted into the Genovese crime family.   PECORARO further explained that GRUTTADAURIA, whom he described as a "real diplomat," "very calm [, b]ut ... deadly, too," was "handy" to have around in dealing with problems with other gambling clubs.   In the latter stages of my investigation, GRUTTADAURIA was introduced to a Special Agent of the FBI acting in an undercover capacity, to whom he admitted his association with specific captains, or "caporegimes," known to the

---

[2] As part of that prosecution, on July 12, 1989, the Honorable Kathleen A. Roberts, United States Magistrate Judge for the Southern District of New York, authorized FBI Special Agents and members of the New York City Police Department to execute a search warrant at a gambling establishment at West 36th Street, New York, New York, at which GRUTTADAURIA, PECORARO and RUTIGLIANO were all found present and working.   RUTIGLIANO, however, was not charged.

[3] GRUTTADAURIA was referred to in this call as PECORARO's former "neighbor," a fact confirmed by real estate records.

8

FBI based on several confidential informants to be among the current leaders of the Genovese crime family.

### 2. Illegal Gambling

5.    Between February 2003 and the date of the filing of this complaint, GRUTTADAURIA, RUTIGLIANO and PECORARO, organized, managed and profited from the operation of various illegal gambling sites on Long Island, which included: (a) locations purporting to be social clubs catering to a Turkish emigre community, which were operated by defendants KAHRAMAN, SIRIN, SAP, METE and SAHIN, but financed and supplied with video gambling equipment by PECORARO and RUTIGLIANO; (b) restaurants and cafes operated by GRUTTADAURIA, RUTIGLIANO, SALVATORE CESARINO and SALVATORE RUBINO, but which also operated illegal gambling establishments in back rooms; and (c) similar locations operated and supported by GRUTTADAURIA, PECORARO and RUTIGLIANO in partnerships with defendants COSTIGLIOLA, VELLA and CAVALLO.  The investigation revealed that while the clubs were each owned by different groups, they functioned as a single network, under the direct control of RUTIGLIANO and PECORARO, who made daily collections of gambling proceeds at multiple clubs, which collections PECORARO estimated in one intercepted 2003 telephone call were generating "up to $16,000 a week."

6.    With the gambling operations serving as a principal source of illegal income, GRUTTADAURIA and RUTIGLIANO engaged in

financial transactions designed to conceal the source and disposition of profits. Additionally, RUTIGLIANO and PECORARO enforced their control over the operation of Turkish gambling clubs through extortion and obstruction of justice aimed at those who sought to replace the defendant's gambling machines or seek help from law enforcement.

### 3.  **Money Laundering Sting**

7.  During the latter phase of this investigation, between August 2004 to the present, GRUTTADAURIA was introduced to and met with an individual who represented himself to be a trafficker in stolen merchandise seeking to launder the proceeds of these contraband goods.  This individual, in reality a Special Agent of the FBI working in an undercover capacity (the "FBI U/C"), became closely involved in laundering efforts with GRUTTADAURIA. In January 2005, the FBI U/C was introduced by GRUTTADAURIA to defendant DAVID GROSS, an elected Judge of the Nassau County District Court, who readily joined the scheme to launder money provided by the FBI and represented to be the proceeds of illegal activity.  GROSS, in turn, recruited the defendant LAND and also developed the plan to use LAND's Freeport, New York restaurant to launder approximately $130,000 in funds represented to be the proceeds of interstate trafficking in stolen merchandise.  In other meetings, GROSS and GRUTTADAURIA took possession of diamonds and other jewelry that the FBI U/C represented to be stolen, and by

10

using their respective contacts in New York and elsewhere, GROSS and GRUTTADAURIA sold these items, which were worth tens of thousands of dollars.

C.   **Details Of The Charged Schemes**

      1.   **The Illegal Video Gambling Operations and Money Laundering**

      8.   Based on my training and experience, I know that video gambling machines provide, upon a deposit of money into the machine, the opportunity to play a game of chance by manipulating buttons on the player control console. The machines simulate draw poker or slot machines, where the object is to group symbols and icons (e.g., cards, fruits, numbers, dominos and the like) into winning combinations and thus earn "credits," or points. The amount of "credits" or points that can be won varies according to the particular game and the odds established for that game. The "credits" can be used to play additional games without depositing more money into the machine, or they can be presented to the owner or the operator of the premises who will pay cash to the player for each "credit." The illegal gambling devices are programmed to accept U. S. currency in denominations of between $1 and $100. These video gambling machines bear names that include, but are not limited to, the following: Joker-Poker, Pot o' Gold and Cherry Masters. Every video gambling machine has two key factors: (1) the final result of the machine is determined by chance, and (2) the machines pay out, in the long term, less than they take in. The

player has no control over what particular card, number or object will be flashed on the screen during the course of the game although the owner of such machines can control the percentage (i.e., retention ratio) of winning combinations and the number of "credits" to be won for each such combination.

9.    The manufacture, possession or distribution of these video gambling devices is illegal under New York State law when the "device is to be used in the advancement of unlawful gambling activity."   New York State Penal Law § 225.30(3).   Unlawful gambling under New York law is defined as any activity, not specifically authorized by law, where a person risks something of value on the outcome of a contest of chance not under his control upon an agreement or understanding that he will receive something of value in the event of a certain outcome.   New York State Penal Law § 225.00(2) and (12).  Title 18, United States Code, Section 1955(a), provides criminal penalties for anyone who conducts, finances, manages, supervises, directs or owns all or part of an illegal gambling business.   An "illegal gambling business" is defined under 18 U.S.C. § 1955(b)(1) as a gambling business which is a violation of the law of the State in which it is conducted, involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business, and has been or remains in substantially continuous operation for a period in excess of thirty days.

10.   In or about February 2003, Confidential Source 1 ("CS-1"), an individual whose information has proved highly reliable and accurate, and has been extensively corroborated, advised the FBI of the existence of a series of social clubs in Nassau and Suffolk counties catering to Turkish emigres that were, in fact, fronts for illegal gambling establishments.  CS-1 advised that based on personal observation, the clubs were supervised by Turkish immigrants but were financed, equipped, serviced or controlled by what CS-1 termed "Italian mafia."  According to CS-1, as well as several intercepted telephone calls outlined below, the various operators of the Turkish clubs identified herein knew each other and were aware of each other's businesses, coordinated to some degree the locations in which new clubs would be opened to reduce saturating any one geographic location, and also were aware that each received gambling machines and funding from the same "Italian mafia" associates.  CS-1 identified the organized crime associates who were backing these clubs as "Ronnie" and "Joe," both of whom were subsequently identified in the course of my investigation as RONALD PECORARO and JOSEPH RUTIGLIANO.  CS-1 estimated that PECORARO and RUTIGLIANO at that time controlled some 100 illegal video gambling machines at various Turkish clubs.

11.   During the week of February 17, 2003, CS-1 spoke to and consensually-recorded a conversation with PECORARO about PECORARO's efforts to install illegal gambling devices within CS-

1's place of business.  During the conversation, PECORARO stated the following in pertinent part:

> CS-1:      You gonna put only Cherry or Joker-Poker also?
>
> PECORARO: Whatever it calls for, I'll put anything, you know, we can make money in, you know what I mean, whatever...."

12.  During the week of February 24 of 2003, CS-1 recorded a follow-up call regarding PECORARO's continuing negotiations to install video gaming equipment, which contained the following exchange, in pertinent part:

> CS-1:      You're not paying [i.e., offering] enough money.
>
> PECORARO: I give you a thousand a machine.
>
> CS-1:      Thousand each machine, a thousand is nothing man, if you can give me five thousand each we could do it.
>
> PECORARO: You're gonna get half the money too when we do it.

I believe this latter statement referred to the fact that PECORARO and RUTIGLIANO share the profits from the operation of their equipment with each club's owner.  Set forth below is some of the evidence concerning the participants in the various gambling establishments.

                 i.        **MEHMET SAP**
                           **The Route 112 Club**
                           **Medford, New York**

13.  In April 2003, a disturbance involving a club patron and CS-1 took place inside a Turkish social club located at 2215

Route 112, Medford, New York (the "Route 112 club"), prompting a response by local police officers.  Through information provided by CS-1 and court-ordered interceptions of wire communications I reviewed, I have determined that the Route 112 club was owned by defendant MEHMET SAP.  However, RUTIGLIANO and PECORARO maintained an interest in the club as evidenced by their expressed concern that CS-1 may have drawn the attention of local law enforcement threatening discovery of the illegal gambling machines inside.  I reviewed several tape-recorded messages left on CS-1's answering machine during this time.  In one recording, RUTIGLIANO demanded a meeting with CS-1 because, "I didn't like what you did in Patchogue[4] . . .."  In another recording, PECORARO left the following message:

> [T]his is Ronnie.  I really don't like what, what you did, . . .. You know those clubs are my clubs;  I got, I got the machines there;  I'm losing a clubs [sic];  I got stuck a, like, tons of fuckin' money and you gotta do this bullshit.  I mean, I, I leave you alone but you're gonna have a problem with me.  Don't think-- I'm not one of these fuckin' Turks you can, you can fuck around, you know what, you don't wanna have a problem with me.  I'll stop by . . . and start breaking your balls down there, with maybe eight, nine of my friends.  You gotta just cut the bullshit out now.

14.  In a separate call on April 15, 2003, PECORARO contacted CS-1, who complained about earlier threats he received from RUTIGLIANO about the Route 112 club disturbance.  At one

---

[4] The club at 2215 Route 112 is located in the Patchogue-Medford school district, near the Patchogue town border, thus explaining PECORARO's reference.

point, CS-1 and PECORARO had the following exchange:

> CS-1:    Listen, who's this fuckin' Joe [RUTIGLIANO]? He
> work for you or he's your partner?

PECORARO: No, he's a partner.

15. Beginning on October 3, 2003 and continuing until March 9, 2004, the Honorable Joanna Seybert, United States District Judge for the Eastern District of New York, authorized the interception of wire communications over three mobile telephones used by PECORARO and RUTIGLIANO as well as a fourth, used by GRUTTADAURIA.  On October 17, 2003, at approximately 3:46 p.m., RUTIGLIANO reported that the defendant MEHMET SAP had paid him $712, "plus five hundred towards the fifteen thousand."  During the weeks and months that followed, PECORARO and RUTIGLIANO were intercepted almost daily discussing various sums of money that had been collected from the defendant SAP, generated by the operation of video gambling machines.

16. For example, on December 18, 2003, at approximately 11:05 a.m., RUTIGLIANO called SAP to advise him that SAP's "slot machine" was about to be delivered.  SAP said he understood and that he was headed to the Route 112 club.  A short time later, an FBI agent conducting surveillance in this investigation observed the delivery of what appeared to be a video gambling machine at the club.

17. On March 5, 2004, Suffolk County Police Department officers and detectives executed a state search warrant at the

16

Route 112 club, where they seized, among other evidence, six video gambling machines, which on the basis of wiretap interceptions I reviewed, I know were provided by PECORARO and RUTIGLIANO.

**ii.      NEDIM SIRIN**
**The Route 109 Club**
**Farmingdale, New York**

18.   During a recorded call on April 15, 2003, PECORARO told CS-1 that he, RUTIGLIANO and others were opening a new gambling club at 898 Route 109, Farmingdale, New York ("Route 109 Club").   Thereafter, the following exchange took place:

CS-1:     Who's opening it?

PECORARO: NEDIM

CS-1:     NEDIM?

PECORARO: Yeah.

CS-1 identified "NEDIM" as the defendant NEDIM SIRIN.   My investigation confirmed this information.

19.   Specifically, during June and July 2003, FBI surveillance observed patrons entering and leaving the Route 109 club.   On July 25, 2003, FBI agents observed RUTIGLIANO drive to and briefly stop at this location, while a vehicle parked outside bore license plates that New York State Department of Motor Vehicles records subsequently revealed belonged to the defendant NEDIM SIRIN.   On October 4, 2003, at approximately 4:34 p.m., PECORARO was intercepted calling RUTIGLIANO to report visiting "three joints" on that day, including "NEDIM'S right now."   The two

men then discussed sums of money that were earned or still owed at NEDIM SIRIN's club.

20. On numerous dates thereafter, RUTIGLIANO reported collecting other sums from SIRIN, among others, as well as collections from SIRIN on additional outstanding loans. For instance, on November 9, 2003, RUTIGLIANO told PECORARO, "I got a thousand from NEDIM . . . plus, he gave me five hundred towards his loan."

21. I have also obtained information in this investigation from Confidential Source 2 ("CS-2"), an individual whose information has been reliable and corroborated in the past. In or about August 2005, PECORARO admitted to CS-2 that he still controlled gambling operations at the Route 109 club.

### iii.   MUSTAFA KAHRAMAN
### The Woodfield Road Club
### West Hempstead, New York

22. Between October 2003 and March 2004, RUTIGLIANO repeatedly contacted an individual at a telephone number, who answered to the names "MUSTAFA" and "Mike." Analysis of this telephone revealed that it was subscribed to the defendant MUSTAFA KAHRAMAN. Several interceptions over RUTIGLIANO's telephone during this time further revealed that KAHRAMAN knew of RUTIGLIANO's support of other Turkish social clubs, and that KAHRAMAN himself communicated with certain other operators of the Turkish social clubs, specifically, BIROL METE, NEDIM SIRIN and MECIT SAHIN.

Furthermore, as demonstrated below, KAHRAMAN was equally aware of RUTIGLIANO and PECORARO's support of gambling operations run by defendants GIOVANNI VELLA and JOHN CAVALLO at an Italian social club located only a few yards away from KAHRAMAN's own gambling premises.

23.  On October 4, 2003, after being observed visiting SIRIN's Route 109 club, RUTIGLIANO drove to 129 Woodfield Road, West Hempstead, New York, (the "Woodfield Road club"), where he made another brief stop at a storefront that displayed a sign claiming to be a Turkish soccer club.  The earliest mention of this location came during the April 15, 2003 call with CS-1 in which PECORARO claimed that he controlled a "Turkish place" near a Western Beef supermarket in West Hempstead, New York – a description consistent with the strip mall that RUTIGLIANO was observed visiting on October 4.

24.  At approximately 4:34 p.m. on October 4, 2003, RUTIGLIANO referred to "West Hempstead" as among the "three joints" he had visited that day.  RUTIGLIANO stated that the Woodfield club had not lost much during the previous night, estimating the loss at $225.  RUTIGLIANO added that the un-named operator of the Woodfield Club got "real panicky . . [he] wants to make money" and complained that RUTIGLIANO had made "fruit come out [too] much", an apparent reference to a slot-machine type video gambling machine.

25.  On October 5, 2003 at approximately 4:07 p.m.,

RUTIGLIANO reported to PECORARO in an intercepted call that he had just pulled up to "West Hempstead." Approximately 20 minutes later, RUTIGLIANO reported back to PECORARO that they had made $450 "on six grand, plus" a reference to money that the defendants provided this club to fund pay outs to winning bettors who play any of the gambling machines at the Woodfield Road club. Money left by RUTIGLIANO and PECORARO at this and other gambling clubs was referred to as the "bank."

26.  On November 22, 2003, at approximately 11:13 a.m., PECORARO received a call from RUTIGLIANO, who reported that he had learned from KAHRAMAN that five gunmen had robbed some $5,000 from the Woodfield Road club's "bank" the night before. RUTIGLIANO said he was on his way to the club to tell KAHRAMAN that the "machine will have to make the five thousand back," in other words that PECORARO and RUTIGLIANO would not replace the $5,000 stolen from the "bank."

27.  On January 6, 2004, RUTIGLIANO spoke to PECORARO about operations at their various gambling clubs. After accounting for costs such as rent and "like three thousand dollars to fix [up]" the Woodfield Road club with new security cameras and other items, RUTIGLIANO reported that he and PECORARO netted "eleven forty" from all clubs in their control on that day. RUTIGLIANO added, "All I know is that the best guy is NEDIM [SIRIN] and this guy MUSTAFA [KAHRAMAN] over here, RON."

iv.        **GIOVANNI VELLA**
              **JOHN CAVALLO**
              **The Delta Seven Club**
              <u>**West Hempstead, New York**</u>

28. On November 29, 2003, PECORARO was intercepted speaking to a Florida resident known to the FBI, (referred to hereafter as "Mike Doe") to seek his support in negotiations to place video gambling machines inside a social club. Through subsequent interceptions and collateral investigation, agents of the FBI determined that the club under discussion was the Delta Seven located at 115 Woodfield Road, West Hempstead, New York in the same strip mall as KAHRAMAN's Woodfield Road club. During this intercepted conversation, PECORARO told Mike Doe that he had met with the club's owner, "Mousey," later identified as the defendant GIOVANNI VELLA, and another individual named "Jack," who PECORARO said "seemed like he was, uh, the main guy there" and "calling the shots." At first, Mike Doe appeared to believe that PECORARO was referencing another individual named "Jack," whose identity is known to the FBI, and is believed to have an interest in a Deer Park gambling club operated by the defendant MICHAEL COSTIGLIOLA. The misunderstanding over the reference to "Jack" was eventually cleared during the conversation. Based on personal observation of an FBI agent during this and prior investigations, the "Jack" PECORARO referenced in this call has been identified as the defendant JOHN CAVALLO, who is known by the FBI to be a long-time

21

associate of Peter Gotti, a former captain and acting boss of the Gambino crime family.

29.  During the November 29th call to Mike Doe, PECORARO also stated that VELLA indicated, "Ya know, 'You're gonna have to keep the machines for about a year then I might want to get my own machines.'"  PECORARO told Mike Doe that he liked the amount of business he observed at the Delta Seven club, but that he wanted "a commitment that they're not gonna push me out in a year from now." PECORARO continued that he would split the proceeds from the operation of the gambling machines with VELLA and his partners "fifty/fifty."  Mike Doe then asked, "And who takes care of me?" PECORARO said he hoped that Mike Doe could obtain his share of the profits from VELLA and his partners, because PECORARO explained, "I got three partners," identifying one as "Nicky, you don't know him. He's right over by, ah, you know that place I eat in."[5]  Mike Doe disagreed, insisting that PECORARO "take care of me" because Doe said VELLA had two or three partners as well in the Delta Seven. The conversation ended with PECORARO agreeing to arrange sharing his proceeds from the Delta Seven operation with Mike Doe.

30.  In a separate call, also on November 29, 2003,

---

[5] On the basis of FBI physical surveillance of GRUTTADAURIA and PECORARO, as well as confidential source information and subsequent admissions by GRUTTADAURIA to an undercover special agent, this was a reference to a restaurant in Queens, New York (the "Restaurant"), which is owned by and functions as a meeting place for a high-ranking member of the Genovese crime family known to the FBI.

PECORARO repeated to RUTIGLIANO the status of negotiations with VELLA as well as his conversation with Mike Doe.  PECORARO said VELLA wanted "two of those things," later referring to them as a "Pot O' Gold" and a "slot machine."   The two defendants agreed they would have to borrow money to purchase this additional equipment.  PECORARO also added that he wanted to share their profits from the operation of the Delta Seven club with Mike Doe because, "I want Mikey to really be in our corner."  Referring to CAVALLO, PECORARO added, "[Mousey's] got a little strength behind 'em too."  RUTIGLIANO agreed with the plan and said, "We, we can split him [Mike Doe] and Beaver [GRUTTADAURIA] up."  Ultimately, the two agreed that even with this dilution of profits, installing gambling machines at Delta Seven was advantageous.  At one point PECORARO noted that the club was "mobbed" and "I heard last night they were betting thousands there. . .."   However, PECORARO insisted that he would seek a commitment from VELLA and CAVALLO that their gambling equipment would remain at the club for at least four years before VELLA sought to install his own machines.

        31.  On December 2, 2003, RUTIGLIANO called GRUTTADAURIA to report to him that negotiations regarding Delta Seven "had come through" and that he and PECORARO had sent the money to buy "two of those things that they like. . .."  RUTIGLIANO went on that the Delta Seven was an established place and described it as very busy and a place "[that's] gonna be a payday."  GRUTTADAURIA responded,

"Oh, thank God."

32. On December 13, 2003, agents intercepted a call from RUTIGLIANO who left a voice mail at a phone that answered, "John Vella." RUTIGLIANO stated: "Yeah, hi John, Joe Box. Ah, two machines came in. Wanna try and set 'em up and uh deliver 'em by Monday, okay?"

33. In or about early January 2004, a Nassau County Police Department (NCPD) detective, acting in an undercover capacity, entered the Delta Seven club. During the visit, the undercover detective spoke to CAVALLO, who indicated that the video gambling machines present inside did in fact pay bettors money.

34. On January 6, 2004, in a conversation about the "bankroll" at the Delta Seven, RUTIGLIANO reported that, "Mousey's got the five dimes, I, we didn't touch the money," because VELLA was not present when he visited the club. According to RUTIGLIANO, CAVALLO, who was present, either did not have access to or would not permit RUTIGLIANO access to the gambling machines without VELLA being present. I learned that gambling machines keep electronic records tracking their earnings and pay outs. Those records are then used by the defendants to calculate their profits from the previous night's operation. These record are accessed through a locked panel on the machine.

35. On or about January 9, 2004, the NCPD obtained search warrants for the Delta Seven and Woodfield Road clubs.

However, the execution of these warrants was delayed when electronic surveillance in this investigation had revealed that a number of the defendants had learned from an unknown source about the impending law enforcement action. Out of concern for the safety of law enforcement officers, the FBI notified the NCPD about the breach of secrecy. Despite the delay, this investigation intercepted a series of communications between PECORARO, RUTIGLIANO, VELLA, KAHRAMAN, SIRIN and SAHIN demonstrating how their various gambling clubs operated in a coordinated fashion.

36. On January 9, 2004, RUTIGLIANO received a call from KAHRAMAN, a portion of which follows:

RUTIGLIANO:     Hello?

KAHRAMAN:       Yeah, the Mouse called next door.

RUTIGLIANO:     Who called?

KAHRAMAN:       Ah, John.

RUTIGLIANO:     John?  What'd he want?

KAHRAMAN:       He goes, uh, "I'm not, uh, a hundred percent so much, seventy-five percent they're gonna bust my place up."

RUTIGLIANO:     They're gonna bust it up?

KAHRAMAN:       Yeah, that's what he said.

RUTIGLIANO:     They're moving, you mean?

KAHRAMAN:       No! The police [sic] gonna bust 'em up.

37. RUTIGLIANO immediately called VELLA, who asked RUTIGLIANO to meet him at the Delta Seven club. Later that night,

RUTIGLIANO reported on his meeting to PECORARO, and the two agreed to temporarily remove the gambling machines from both VELLA's Delta Seven and KAHRAMAN's Woodfield Road clubs as well as the money in their banks.

38.    In a follow-up call, after another discussion with VELLA and CAVALLO, RUTIGLIANO reported "They, what Mousey's trying to tell me, and the other guy too, Jack, what Mousey's trying to tell me it's not him, it's Mike [i.e., KAHRAMAN] that's getting hit tonight." RUTIGLIANO then reiterated a subsequent conversation he had with KAHRAMAN:

> You know how he is . . . . He don't give a flying fuck. But, uh, he goes, "Look, ya know, it's up to you Joe, it's your machines, I don't give a fuck." And I go, "If they come, they're gonna ask whose it is.  You just tell them you bought it in an auction, or a Spanish guy kept selling you one once a week and . . . all of a sudden you got four or five of 'em there."

Ultimately, RUTIGLIANO said that he and KAHRAMAN hid the gambling machines in an alley away from the club.  RUTIGLIANO also reported collecting "fourteen hundred" from KAHRAMAN and that "Mousey" had a "seven dime bank now."  Finally, RUTIGLIANO said that "Mousey" left his machines in place at the Delta Seven, convinced that the target of the search warrant was KAHRAMAN's club.

39.    On January 14, 2004, NCPD officers and detectives executed their search warrants at the Delta Seven and Woodfield Road clubs.  CAVALLO was present though he did not identify himself as a principal in the club.  NCPD records reveal that VELLA was

arrested and charged with promoting gambling, second degree and possession of gambling devices, second degree, in violation of New York Penal Law, Sections 225.05 and 225.30(2). Simultaneously, NCPD officers arrested KAHRAMAN at the Woodfield Road club, and also charged him with promotion and possession of gambling devices.

40.    While the warrants were being executed, RUTIGLIANO was intercepted calling PECORARO and alerting that the Delta Seven and Woodfield Road clubs had been "busted." RUTIGLIANO added, "Now NEDIM wants his machines out now." Both defendants concluded that neither SIRIN nor SAP's gambling clubs were "safe" and that the gambling machines should be moved out of each. RUTIGLIANO ended by saying he would "tell [Route] 112 just lock the doors and go home." PECORARO warned RUTIGLIANO to stay away from "NEDIM's place" adding that SIRIN already "gave me ten thousand."

41.    At approximately 11 p.m., on January 14th, RUTIGLIANO called PECORARO and discussed the banks at VELLA and KAHRAMAN's clubs that may have been taken in the NCPD searches. As for the video gambling machines seized at these locations, RUTIGLIANO said, "We lose [sic] $35,000 in machines tonight."

42.    On March 1, 2004, RUTIGLIANO was intercepted speaking to GRUTTADAURIA about "that Hempstead place." RUTIGLIANO said, "I know we're gonna go back in after the court case."

    GRUTTADAURIA:    All right, good. . . . All you gotta do Joe, you keep everything afloat there, I'm trying –

    RUTIGLIANO:    I'm trying Nicky.

43. On March 29, 2004, KAHRAMAN and VELLA pleaded guilty to disorderly conduct in violation of New York Penal Law § 220.20, a criminal violation, and were each sentenced to pay a $150 fine.

44. Intercepts of wire communications through March 2004, and physical surveillance conducted as recently as August 19, 2005, reveal that the locations called the Delta Seven and Woodfield Road clubs have resumed gambling operations.

**v.    SALVATORE CESARINO**
**Cafe Venezia**
**Shirley, New York**

45. Beginning in or about November 2003, RUTIGLIANO was repeatedly intercepted talking to an individual named "Sal" about, among other things, sums of money, "slot machines," "card games" and "markers" – the latter being a common term for a short-term loan by the operator of a gambling establishment to cover a player's betting losses. Moreover, during several of these intercepted conversations, the individual initially identified only as "Sal," demonstrated knowledge of RUTIGLIANO's operation of other gambling locations, specifically, RUTIGLIANO's operation of a gambling club at the Java Room Cafe and Cafe Venezia, as well as RUTIGLIANO's need to rely on GRUTTADAURIA to permit an expansion of gambling operations at Cafe Venezia, and resolve a dispute with a competing gambling operation unrelated to any of the defendants.

46. These conversations were conducted between RUTIGLIANO's mobile phone and a residential telephone subscribed to

by a female at an address that subsequent analysis of public records revealed is also the address for the defendant SALVATORE CESARINO.

47. Confidential Source 3 ("CS-3"), an individual who has provided reliable information to other FBI agents in other investigations in the past, has identified CESARINO as the manager of gambling operations conducted in a back room of a bakery known as Cafe Venezia, 58B Surrey Circle, Shirley, New York.

48. On November 5, 2003, RUTIGLIANO was intercepted telling PECORARO that he had received a call from SAP and needed to go see him at the Route 112 club because the gambling machines there had lost "a thousand" that day. Afterwards, RUTIGLIANO said he would be driving "to Shirley."

49. On December 13, 2003, at approximately 12:37 p.m., RUTIGLIANO called GRUTTADAURIA seeking permission to expand the illegal gambling club to include a regular card game, in which patrons would pay Cafe Venezia a percentage of winnings. RUTIGLIANO told GRUTTADAURIA that "my man in Shirley" wanted to begin hosting a card game at Cafe Venezia, the profits of which would be split between GRUTTADAURIA, RUTIGLIANO and CESARINO. After GRUTTADAURIA gave his permission, RUTIGLIANO immediately called CESARINO and told him: "Go ahead, you got the green, the green light."

50. On December 16, 2003, at approximately 4:06 p.m.,

RUTIGLIANO placed a call to the phone described above. During this call, CESARINO reported that he had been visited by an individual, whom the FBI has been advised by confidential sources to be a Gambino organized crime family member then in charge of a competing illegal gambling club in Shirley.

51. When CESARINO said he had been visited by this individual, RUTIGLIANO responded, "He keeps interfering, I'm gonna see what happens with him. He interferes too much -- he . . . keep[s] interfering, you're gonna see where he's gonna be. I'll bury him my fucking self. I'll bury him." RUTIGLIANO went, "I got an okay to do a shit little game, five, six nights a week and he wants to make trouble over that?" CESARINO and RUTIGLIANO then explored how this individual might have discovered the game that CESARINO was running at Cafe Venezia. RUTIGLIANO said, "Who gives a fuck what he wants. I don't give a fuck about him. I'll put a pistol in his mouth and pull the trigger." The conversation ended with RUTIGLIANO suggesting that Sal tell the individual that, "I got people coming from Queens." In your affiant's opinion this may have been a reference to GRUTTADAURIA, whose support within the Genovese family emanates from Corona, Queens.

52. On or about December 27, 2003, interceptions over RUTIGLIANO and PECORARO's mobile phones revealed that GRUTTADAURIA was preparing to attend a meeting or "sit down" with the same individual referenced above in the paragraph above who visited

CESARINO.  The purpose of the meeting was to resolve a conflict arising from that individual's competing gambling club and the gambling operations at the Cafe Venezia.  Also on or about December 27, 2003, I and other FBI Special Agents conducted surveillance at the Cafe Venezia and observed GRUTTADAURIA, RUTIGLIANO, CESARINO and at least one other individual meeting inside the front area of the cafe.  Based on contemporaneous interceptions, this meeting preceded GRUTTADAURIA's "sit down" with the individual who had previously visited CESARINO at the Cafe Venezia.

53.  On February 11, 2004, Suffolk County Police Department officers and detectives executed a state search warrant at Cafe Venezia.  Among other evidence, officers seized five video gambling machines.

**vi.    SALVATORE RUBINO
The Java Room Cafe
Farmingdale, New York**

**MICHAEL COSTIGLIOLA
The Cafe Italia
Deer Park, New York**

54.  In November 2003, RUTIGLIANO was intercepted discussing the opening of a new club called the "Java Room." Physical surveillance conducted by other FBI agents as well as subsequent interceptions, revealed GRUTTADAURIA, RUTIGLIANO and PECORARO's joint ownership and control of a restaurant named the Java Room Cafe, (the "Java Room"), located at 314 Main Street, Farmingdale, New York.  While the front portion of this business is

a restaurant opened to the public, a back area, open only to invited guests, conceals a room equipped with video gambling machines and other gaming equipment.

55. Electronic surveillance has also revealed that RUTIGLIANO and PECORARO, with GRUTTADAURIA's assistance, had previously installed several gambling machines at another location called the Cafe Italia, 1953 Deer Park Avenue, Deer Park, New York. The club was referred to by the defendants as "DP" or "Deer Park." Several reliable FBI sources have identified the Cafe Italia as a long-established gambling operation run by members the Bonanno organized crime family of LCN.

56. New York public records reveal that Cafe Italia is operated by M.D. Procida Napoli Corp., which in turn lists the defendant MICHAEL COSTIGLIOLA as an officer.

57. On November 6, 2003 at approximately 1:59 p.m., RUTIGLIANO left a voice mail message on a telephone subscribed to GRUTTADAURIA. RUTIGLIANO reported that he had seen "Mr. Green" adding that "the 500 is there, the 350 from Farmingdale is there and the 600 excess from DP. So, 1450 total."

58. When RUTIGLIANO left this message, FBI agents were simultaneously conducting surveillance and observed him inside a Green Point Savings Bank branch in Commack, New York between 1:54 and 1:56 p.m., minutes before his intercepted call to GRUTTADAURIA. On several dates thereafter, GRUTTADAURIA received similar calls

from RUTIGLIANO referring to visits and sums of money having been left with "Mr. Green."

59.   Through grand jury subpoenas, I have reviewed Green Point Bank records revealing that GRUTTADAURIA maintained an account in his own name into which cash sums were deposited corresponding to sums discussed by RUTIGLIANO on intercepted calls in which the latter referred to "Mr. Green," RUTIGLIANO's apparent code for the bank.  These records further revealed that in addition to other deposits, GRUTTADAURIA received an average of $2,000 per month in deposits corresponding to RUTIGLIANO's intercepted calls referencing "Mr. Green."

60.   On December 11, 2003, at approximately 12:37 p.m., RUTIGLIANO called GRUTTADAURIA.  After a brief discussion about the weather, the following conversation took place:

RUTIGLIANO:    Anyway, I just seen Mr. Green.

GRUTTADAURIA:  Ah, good.

RUTIGLIANO:    But I'm one week behind though.

GRUTTADAURIA:  Yeah?

RUTIGLIANO:    I'll get caught up next week.

GRUTTADAURIA:  All right.

RUTIGLIANO:    Farmingdale, [the Java Room] I'm in the hole a little bit.

GRUTTADAURIA:  Yeah?

RUTIGLIANO:    Between [the] nut and just not holding the money and markers that make things pay a little bit --

GRUTTADAURIA:    Yeah.

RUTIGLIANO:    – you know what I mean?  It's a little pain in the ass, it's not strong enough yet.  I just wanted to let you know that and, good thing is we put in Hempstead yesterday and there is no excuses there, that should get off and--

GRUTTADAURIA:    Yeah good.

RUTIGLIANO:    – and two are coming through the mail.[6]

GRUTTADAURIA:    Beautiful.

RUTIGLIANO:    There's no excus– There's money, Nick, there's money in there.  There is no excuses why we shouldn't make money in there.

GRUTTADAURIA:    Yeah, good, good to hear.

RUTIGLIANO:    There will be an envelope there, should be weekly.

61.  As the conversation concluded, GRUTTADAURIA stated: "You know Joey, I was talking, what is big, what people are going crazy with is that Texas Holding [sic]," referring to a form of poker known as Texas Hold 'em.  RUTIGLIANO agreed that this was a popular game, and GRUTTADAURIA ended the conversation by suggesting they "set up with something like that. . . ."

62.  Between October 2003 and March 2004, RUTIGLIANO and GRUTTADAURIA spoke repeatedly about the failure of the Cafe Italia personnel to generate significant profits from the operation of their machines.  RUTIGLIANO also complained that the defendant

---

[6] I believe this was a reference to the expected delivery of the two gambling machines for the Delta Seven club.  See ¶ 32, supra, RUTIGLIANO to VELLA: "Ah, two machines came in."

MICHAEL COSTIGLIOLA used keys to the gambling machines when RUTIGLIANO was not present, thereby making it impossible to confirm supposed losses at Cafe Italia.

63. On December 14, 2003, RUTIGLIANO was intercepted speaking to an individual, who answered to the name "Sal" and was subsequently identified by telephone subscriber records as the defendant SALVATORE RUBINO, who said he was "at the club." After discussing various sums of money, RUBINO reported that he "left a thousand dollars in the bank."

64. On December 15, 2003, RUTIGLIANO was intercepted speaking to RUBINO. RUTIGLIANO complained about not having enough help to supervise the various gambling clubs. Specifically, RUTIGLIANO referenced the operations at Cafe Italia and the role of COSTIGLIOLA which he found lacking. At one point RUTIGLIANO drew a comparison between the Cafe Italia operation and another operation over which he had more direct control stating: "You know, what sucks, like Shirley, I got Sal over there . . . . You know, he runs it." Based on my observations and review of other intercepted conversations, "Sal" is a reference to defendant SALVATORE CESARINO and "Shirley" is a reference to the Cafe Venezia.

65. On January 12, 2004, at approximately 9:59 a.m., RUTIGLIANO and PECORARO were intercepted in a telephone conversation in which the former noted that he owed "Nicky," $500

each week "and whatever is extra in these things" from the operation of illegal video gambling machines. At approximately 6:11 p.m., also on January 12th, GRUTTADAURIA called RUTIGLIANO to discuss the operation of "DP." RUTIGLIANO reported, in sum and substance, that there was no money in the machines at "DP" and that about $2,400 was missing. RUTIGLIANO added that COSTIGLIOLA or an employee at Cafe Italia, had keys to the machines there. GRUTTADAURIA, in an obviously angry voice, directed RUTIGLIANO to change the locks to "our machines" or retrieve the keys, adding that he was to pass on a message to COSTIGLIOLA that he would be responsible for the money. "I don't give a fuck," said GRUTTADAURIA. "Tell him [COSTIGLIOLA] how that's, how it's gonna be. . .. Tell him it's from me."

66. Later in the conversation, RUTIGLIANO said that he was "going to see Mr. Green with the normal five tomorrow." GRUTTADAURIA then complimented RUTIGLIANO on the Java Room. (FBI Special Agents observed that GRUTTADAURIA had visited the Java Room on January 10, 2004.) Responding to GRUTTADAURIA's compliment, RUTIGLIANO said, "You'll be rewarded, you'll see."

67. On March 1, 2004, RUTIGLIANO reported to GRUTTADAURIA that he had "cleared" $1,100 from the Java Room that week adding, "you're gonna get a third of that. . .." GRUTTADAURIA answered, "Yeah, whatever that comes to." In a reference to cash, RUTIGLIANO continued that he would be putting in "two weeks of Mr.

Green tomorrow."

68. On March 5, 2004, officers and detectives of the Nassau County Police Department executed a search warrant at the JAVA ROOM, seizing several video gambling machines from a back room in that club. RUBINO was also arrested and charged with promoting gambling and possession of gambling devices in violation of New York Penal Law. Shortly after the warrant execution, RUTIGLIANO reported to GRUTTADAURIA that "they hit me in the Java Room today" adding that "Sal" panicked and "now Mike [COSTIGLIOLA] is over here shitting too." RUTIGLIANO added that COSTIGLIOLA had decided not to remove the gambling machines from Cafe Italia because "that's how he pays his bills." Finally, RUTIGLIANO told GRUTTADAURIA that he had already instructed an attorney, who was also representing RUBINO, to find out the source of the information used to obtain the state search warrant.

69. According to CS-2 and FBI surveillance, as of August 2005, video gambling machines as well as other gambling activities remain in operation at the Cafe Italia in Deer Park under the supervision of COSTIGLIOLA. On August 25, 2005, in a telephone conversation with the FBI U/C, GRUTTADAURIA said that the gambling machines at the Java Room had been moved to another locations nearby. GRUTTADAURIA did not identify the new location.

**vii.      BIROL METE**
**MECIT SAHIN**
**Bay Shore Road Club,**
**181 Bay Shore Road**
**Bay Shore, New York**

70.   In or about June 2003, CS-1 identified BIROL METE as an individual who had a gambling establishment at 181 Bay Shore Road, Bay Shore, New York, (the "Bay Shore Road club") with video gambling machines provided by PECORARO and RUTIGLIANO. CS-1 further advised that METE's nickname is "Billy Boy."

71.   Subsequent interceptions of both RUTIGLIANO and PECORARO revealed that METE operated the club, but also borrowed money from RUTIGLIANO and PECORARO to cover his own gambling debts. On October 21, 2003, at approximately 9:27 p.m., METE called PECORARO to say. "I am going to give my $1,000 tonight, okay?"

72.   On November 25, 2003, RUTIGLIANO reported to PECORARO that he had just met "Billy Boy" and found out that out of a "two dime bank, we lost seventeen hundred of it." In your affiant's opinion, the use of the phrase was code for $2,000. Moreover, RUTIGLIANO reported that an individual named "John," later identified as MECIT SAHIN, had become a partner in the Bay Shore Road club.

73.   During the period of electronic surveillance, from October 2003 to March 2004, RUTIGLIANO was intercepted numerous times reporting on collections made from SAHIN and METE's Bay Shore club.  For example, on December 7, 2003, RUTIGLIANO reported to

PECORARO, that "Billy Boy" was looking for additional money to replace $2,000 that had recently been paid out of the bank to video machine winners.

74. On December 8, 2003, PECORARO was intercepted speaking to SAHIN about, among other things, a "machine [that was] four hundred dollars short" when it was opened by METE.

75. On December 13, 2003, SAHIN reported to RUTIGLIANO that a "Major Poker" machine was malfunctioning and not taking money. RUTIGLIANO indicated that he would get an associate of his to go out and try to repair the machine.

## 2. **Extortion and Obstruction of Justice**

76. By late December 2003, according to intercepted telephone calls, defendant METE began arguing with RUTIGLIANO and PECORARO, first to seek additional loans to cover his gambling debts, and later regarding an intention by METE to remove RUTIGLIANO's and PECORARO's gambling machines from the Bay Shore Road club and replace them with other machines, the profits from which METE and SAHIN would not have to share.

77. In a series of intercepted conversations, beginning on December 16, 2003, PECORARO and RUTIGLIANO threatened METE and SAHIN with violence should they carry out METE's threat to remove PECORARO and RUTIGLIANO's video gambling machines from the Bay Shore Road club. At approximately 10:06 p.m., RUTIGLIANO called METE. The following is a pertinent part of that conversation:

RUTIGLIANO:     Why are you doing this?  What's the reason?

METE:           I'm tired of losing my own money.

RUTIGLIANO:     So you wanna pull a prank on me and RONNIE?
                What did we do to deserve this?

METE:           You wanna kill me, I'm right here, kill me.
                You threaten me the other day, you come here
                with the fucking army.  You wanna kill me,
                listen, I'm right here.

RUTIGLIANO:     You're outta line; you don't fool people like
                this.

METE:           I have one life left.  You wanna kill me, I
                have one life left.  I don't want the machines
                anymore.  I don't want to bring in other
                machines.

RUTIGLIANO:     Okay.  You put a machine in there, I'm going
                to burn the motherfucker to the ground, I
                swear on my kids.  You have no idea.  You want
                them out, I'll take them out.  Don't fuck with
                me.

The discussion then turned, in substance, to how much METE had lost

by gambling on RUTIGLIANO and PECORARO's gambling machines.

RUTIGLIANO ended the conversation by stating:

> You got a big fucking mouth.  You know what happens to guys
> with big fuckin' mouths, they get in a lot of fucking trouble.
> Here's my advice to you, you better calm down.  Tomorrow or
> the next day, I'll be taking those fuckers out, let me tell
> you something, on my kids, there better not be (screaming,
> unintelligible) . . . I'm not threatening you, I'm threatening
> that fucking joint.  You better have my twenty-five hundred,
> you understand?"

78.  At approximately 10:52 p.m., RUTIGLIANO called

PECORARO to report on the conversation.  RUTIGLIANO stated: "I told

him I'll burn the place down if he puts [someone else's] machines

in there."  PECORARO replied that he would call METE's partner

"John" i.e., MECIT SAHIN to "straighten this out." The conversation concluded with RUTIGLIANO alluding to a threat by METE to "drop[] dimes" on RUTIGLIANO and PECORARO, which your affiant notes is a common reference for calling law enforcement authorities to report criminal activity.

79. At approximately 11:04 p.m., RUTIGLIANO called PECORARO's home telephone. PECORARO reported that he had just spoken to "John" [SAHIN] and told him that if METE put someone else's machines in his club, "he's going to Good Sam's [i.e., Samaritan] hospital." PECORARO continued that when SAHIN told him to "calm down," he responded "'I'm not a nice guy. I did you favors, you think I'm an asshole? Tell that cocksucker I'll take the machines out of there, [and] if he puts one machine in there, he's going to the hospital. . ..'"

80. On December 17, 2003, at approximately 12:02 a.m., RUTIGLIANO called PECORARO. Referring to SAHIN, PECORARO said, "He gave me two thousand, said there's six-seven hundred in the machines. I told him we're gonna pull the machines tomorrow." RUTIGLIANO responded: "Could be dangerous; he's gonna get us in trouble." In fact, as subsequent interceptions revealed, the machines were not removed from the Bay Shore Road club.

81. On January 2, 2004, at approximately 6:16 p.m., RUTIGLIANO called PECORARO to discuss, among other things, changes in partners at one of the Turkish gambling clubs. RUTIGLIANO

referred to the Turks as "crazy," causing PECORARO to respond that they would be the first "to testify against you.  They're weak." RUTIGLIANO added that he was glad that he was known by the Turks only as "Joe."

82.  On January 6, 2004, at approximately 3:15 p.m., RUTIGLIANO received an incoming call from METE.  METE and RUTIGLIANO discussed a new request from METE for yet another loan – a request RUTIGLIANO said PECORARO had denied – as well as METE's renewed threat to either remove PECORARO's and RUTIGLIANO's machines or shut down the gambling club.  During this conversation, RUTIGLIANO noted that METE already owed PECORARO $2,000 and added that the money was not only "Ronnie's" but that it belonged to someone else.

83.  At approximately 3:36 p.m., RUTIGLIANO received a call over his cell phone from PECORARO regarding METE.  RUTIGLIANO conveyed that METE was again threatening to remove the video gambling machines from his club, to which PECORARO responded that he was going to see METE immediately to "straighten him out" and that he would take along another person named Al.[7]

84.  At approximately 4:16 p.m., on January 6th, RUTIGLIANO received a call from PECORARO.  The latter reported in part that he "didn't get Billy but I saw John [SAHIN].  Al and I

_____

[7] FBI special agents were dispatched to intervene, if necessary, in the event of actual violence.

opened up his asshole four feet. * * * 'He's a friend of yours?' we told him, 'He's going to Good Sam hospital.  He's taking a trip over there, [] he touches those machines or pulls those plugs out. You tell that cocksucker.'"  PECORARO then discussed Al's size and the size of his hands.  "He [Al] looks at you, it goes right through you, his eyes.  Fucking John [SAHIN] had to clean out his underwear."

85.  At approximately 9:09 p.m., RUTIGLIANO spoke again to PECORARO.  During the conversation, which included references to other gambling clubs and the possibility that KAHRAMAN might buy METE out of his share of the club, PECORARO reported that Al had caught up to METE and threatened to put METE in the hospital "maybe with one eye out of your fucking head."  The conversation concluded with the two agreeing that Al was the right person to send to read the "riot act" to METE.

### 3.    The FBI Money Laundering Sting

86.  In the course of this investigation the FBI U/C met with and earned the trust of GRUTTADAURIA by posing as a domestic and international trafficker in stolen merchandise – in particular, diamonds, whose criminal activities required him to seek avenues to launder the proceeds of his illicit trafficking.  The FBI U/C secured audio and video recordings of most of the meetings and conversations he had with GRUTTADAURIA and others.  On August 4, 2004, GRUTTADAURIA met with the FBI U/C in Florida and admitted

that he operated gambling clubs on Long Island, and specifically admitted that he had a partner named "Joe" who operated one of these clubs in the back of a restaurant that he identified as the Java Room Cafe.  GRUTTADAURIA invited the FBI U/C to meet him in New York, where the two would have dinner at the Restaurant, which has long been known to law enforcement and the organized crime world as operated by a high-ranking Genovese member.

87.  The investigation also revealed that GRUTTADAURIA was associated with defendant DAVID GROSS, to whom he referred as "the judge."  I have confirmed that GROSS is a Nassau County District Court Judge in Hempstead, New York, elected in 1999.  On March 1, 2004, GRUTTADAURIA was intercepted telling RUTIGLIANO that a meeting he had earlier in the week at the Restaurant had gone well.  After some participants in the meeting left, GRUTTADAURIA recounted, "I sat in the back with ya know, Rom and the judge and we talked for about an hour."  Based on additional investigation as well as other interceptions, I know that "Rom" is the nickname of an acting captain in the Genovese crime family, whose identity is known to the FBI, and that "the judge" was defendant DAVID GROSS.

88.  On August 4, 2004, the FBI U/C met GRUTTADAURIA in Sarasota, Florida for the first time and the two discussed the possibility of opening a gambling club in the New York area. GRUTTADAURIA suggested that he could help the FBI U/C open a similar gambling operation using video gambling machines and

suggested that the two travel to New York in the future.  It was in

this conversation that GRUTTADAURIA stated that once in New York,

he would bring the FBI U/C to dinner at the Restaurant to introduce

the FBI U/C to some "people."

        89.  On December 14, 2004, the FBI U/C recorded a

telephone conversation with GRUTTADAURIA.  The FBI U/C claimed that

he had recently traveled to New York where he sold "excess

diamonds" from Africa to certain individuals and made a $200,000

profit.  At one point during the call, the following conversation

took place:

> GRUTTADAURIA:   I got, the next time, ya know, you're gonna do
> that I, I think I have somebody probably in
> New York that's a, I mean, he spent his whole
> life with jewelry.

> FBI U/C:      Oh, really?

> GRUTTADAURIA:   He, ah, he's pretty big in that field.

Based on subsequent events, including a meeting conducted the FBI

U/C, I have learned that GRUTTADAURIA was referring to a jeweler,

whose identity is known, who operated a business in Manhattan, New

York.

        90.  Later in the conversation, GRUTTADAURIA and the FBI

U/C discussed how large sums of cash might be transported without

being detected and the FBI U/C asked GRUTTADAURIA whether he knew

anyone in New York "that might wanna put money through their

business."  GRUTTADAURIA stated that it was "possible."

        91.  On January 27, 2005, the FBI U/C met GRUTTADAURIA at

Newark Airport, Newark, New Jersey, and the two drove together to the Garden City Hotel, Garden City, New York, where a room had been reserved for GRUTTADAURIA. Starting at approximately 8:00 p.m., the FBI U/C, GRUTTADAURIA, PECORARO and others had dinner together. About 45 minutes into the dinner, the party was joined by GROSS, who stated to the dinner group without any prompting, that he was late because he was running for re-election in November 2005 and had been at a campaign fund raiser. GROSS is in fact facing re-election to the Nassau County District Court in Hempstead, New York in November 2005. After GROSS seated himself at the table with GRUTTADAURIA, PECORARO, the FBI U/C and others, the conversation at the table at first covered a range of pleasantries. At one point, GROSS asked the FBI U/C what business he was in, to which the FBI U/C responded, "import-export." Shortly thereafter, GROSS said that before becoming an attorney, he had wanted to become a businessman and recounted how, as a youth, he was a master of the board game "Monopoly" because he knew all the intricate rules of that game. GROSS stated that he used that same devotion to mastering "rules" when he became a practicing attorney to help business clients of his. GROSS then related how state laws governing campaign finance were intricate, and he was then recorded stating: "I know those rules. I know how to get around those rules, but I know the rules are there and, you know, you know, I know which rules not to break and I know how to get around

everything else.  You know, so cash is not a problem."

92.  After the dinner, GRUTTADAURIA, PECORARO and GROSS, together with the FBI U/C, went to a lounge inside the hotel.  Once there, the FBI U/C told GROSS that he was involved in the diamond business, to which GROSS responded that he knew people in that business.  GROSS then exchanged telephone numbers with the FBI U/C prior to leaving.

93.  On January 28, 2005, the FBI U/C met again with GRUTTADAURIA at the Garden City Hotel.  While in the FBI U/C's room, the FBI U/C showed GRUTTADAURIA a packet of approximately 19 loose diamonds of various sizes that the FBI U/C described as "untraceable."[8]  GRUTTADAURIA attempted unsuccessfully to contact a number of individuals who could sell the diamonds.  Ultimately, aware of GROSS's statements concerning money laundering and knowledge of persons in the jewelry business, the FBI U/C reminded

_____

[8] Section 2315 of Title 18, of the United States Code, makes it a crime for anyone to receive, possess, conceal, store barter, sell or dispose of goods or merchandise of a value in excess of $5,000, which have crossed in interstate or foreign commerce knowing the same to have been stolen, unlawfully converted taken by fraud.  Although the diamonds were in fact FBI evidence seized from previous investigations, and, therefore, not in fact stolen or obtained by fraud, Section 21 of Title 18 provides that wherever it is an element of an offense that a defendant know that property was stolen, converted or taken by fraud, "such element may be established by proof that the defendant, after or as a result of an official representation [i.e., any representation made by Federal law enforcement officers] as to the nature of the property, believed the property to be embezzled, robbed, stolen converted [or] taken." 18 U.S.C. § 21(a).

GRUTTADAURIA that "the judge" had indicated that he knew jewelers. At this point, GRUTTADAURIA agreed that he should contact GROSS and that if GROSS was able to come up with a buyer for the diamonds, the FBI U/C should give GROSS approximately $500.

94.  During the same conversation, GRUTTADAURIA further instructed that if GROSS asked whether the FBI U/C was "with" GRUTTADAURIA he should reply "yes."  With these instructions, the FBI U/C telephoned GROSS and left a voice mail asking him to meet later that day.  Based on my training as well as experience in this and other organized crime investigations, I know that being "with" an individual is commonly used within LCN enterprises to indicate to another party that the person speaking is participating in some illegal scheme with the approval and, if necessary, protection of a superior within the LCN organization.  Being "with" a member of an LCN organization ordinarily requires that the individual share, pay "tribute" or "kick up" some percentage of the proceeds of the illegal conduct to his superior within the organization.

95.  At approximately 4:50 p.m. on January 28, 2005, GROSS entered the FBI U/C's hotel room at the Garden City Hotel. The FBI U/C showed GROSS the same diamonds previously shown to GRUTTADAURIA and represented that the diamonds were "completely untraceable" and "un-marked," a clear reference to their status as stolen property.  The FBI U/C also indicated that he would be willing to pay GROSS a finder's fee for introducing him to an

48

individual who could dispose of the diamonds. After inspecting the diamonds, GROSS indicated that he knew several individuals who might be interested, identifying one as "Mike" and another as "Jesse the jeweler." GROSS then used his cellular telephone to contact "Mike." During this call, the FBI U/C overheard GROSS describe the diamonds as "orphans in need of a new home." Based on the observations and experience of the FBI U/C, GROSS used these terms as coded references to the fact that he believed the diamonds were stolen or otherwise unlawfully taken or converted.

96. Following the telephone call, the meeting continued. GROSS indicated to the FBI U/C that he was in the process of purchasing a restaurant in Seaford, New York and had talked the seller into "holding back" $200,000 "under the table." In other words, he explained, the sale was documented at a lower price to reduce tax burdens by transferring $200,000 to the seller in cash. Additionally, GROSS indicated that he was involved with another restaurant named "Cafe by the Sea" in Freeport, New York. GROSS explained that the owner of the restaurant, whom GROSS identified as "Brady," needed an $8,000 loan that GROSS helped to arrange. In doing so, however, GROSS told the FBI U/C that he warned "Brady" that the individual extending the loan would "break his legs" if "Brady" did not repay the loan. Through additional investigation as well as subsequent events outlined below, I have learned that "Brady" is KIM BRADY LAND, who is an owner of the restaurant Cafe

by the Sea restaurant located in Freeport, New York.

97. Following this meeting at the hotel, the FBI U/C and GRUTTADAURIA drove to the Restaurant in Queens, New York, where they had dinner with others. After dinner, the FBI U/C observed GRUTTADAURIA meeting alone with a high-ranking member of the Genovese crime family, previously described, who is also the owner of the Restaurant, for approximately 45 minutes.

98. On January 29, 2005, beginning at approximately 10:26 a.m., the FBI U/C met alone with GROSS inside the FBI U/C's hotel room. Regarding the diamonds discussed on the previous night, GROSS indicated that his friend "Jesse the jeweler" was out of town and that "Mike" had declined to help dispose of the diamonds because, in GROSS's words, he "got nervous." GROSS elaborated that "Mike" was concerned about the diamonds' lack of papers regarding prior ownership and transfer of title. "If you don't have papers," GROSS said, "it becomes problematic; obviously, you don't have papers. Without papers, moving them at [Mike's] level is a problem." On the other hand, GROSS stated that "Jesse the jeweler" was in a position in the industry that would enable him to dispose of the diamonds even in the absence of proof of ownership. "As far as the paper problems, the paper trail problem, if they're bigger stones, [Jesse] kind of intimated that can be dealt with," GROSS said, adding that the diamonds would have to be bigger than 3 or 4 karats. GROSS concluded that in his opinion,

the FBI U/C would do better using "Jesse," adding that he could give him a better price and therefore he, the FBI U/C and GRUTTADAURIA would all do "better." As the conversation proceeded, GROSS spoke openly with the FBI U/C about other criminal activity he had previously been involved with, including the attempted distribution of untaxed cigarettes and the evasion of gasoline excise taxes through the use of "a guy I had for a while before he got caught." These incidents, GROSS said, occurred before he knew GRUTTADAURIA.

### i.    First Money Laundering Transaction

99.    At approximately 11:06 a.m., on January 29, 2005 the conversation turned to GROSS's possible assistance in laundering money from the FBI U/C's stolen diamond scheme. Various methods were discussed. First, GROSS laid out a plan by which he would launder money through his campaign fund account. Under this proposed scheme, GROSS suggested that the FBI U/C would pose as a political consultant, whose fund raising activities generated the source of cash and checks deposited into GROSS's campaign account. As recorded by the FBI U/C, GROSS said, "Okay, so now you've converted, uh, you got rid of your cash; you got a bunch of checks payable to me, then what I do is I deposit the money and then I pay you for your services." The FBI U/C then asked what GROSS would pay him back, to which GROSS responded, "Give me a percentage, let's talk percentages." The FBI U/C responded by saying that he

understood that he had to make these transactions "worth your while." GROSS then continued that after the deposits had been made, he would draw checks against the campaign fund that would be made payable to the FBI U/C or his nominees. The purported reason for these checks, GROSS said, would be payment for the FBI U/C's supposed work as a professional fund raiser. For this service in washing illicit proceeds through his campaign, the FBI U/C would be charged a laundering fee that they would negotiate. GROSS explained "the whole point is to make it look legitimate."

100. As the conversation progressed, GROSS indicated that one flaw in using his campaign fund would be that because his fund had to be publicly-reported, "What's gonna happen is they're gonna say holy shit, who is this guy that can raise this kind of money and everyone else will come and try to hire you." GROSS laughed at this point. GROSS then suggested another method for laundering funds, which was to create documentation to make it look as if a "party" had been held at a restaurant, for which the FBI U/C would give the restaurant owner $10,000 in cash. In exchange, the restaurant owner would issue checks to various accounts provided by the FBI U/C as purported payment for fund raising expenses incurred in hosting the event. "Who's to say otherwise? That's an easy wash," GROSS explained. In the FBI U/C's presence, GROSS telephoned defendant KIM BRADY LAND, and reported to the FBI U/C that LAND had agreed to meet with them later that day. As for the

"fee" that the FBI U/C would have to pay for such services, GROSS
stated that a ten percent "profit is workable." When the FBI U/C
mentioned the possibility of laundering $25,000, GROSS stated that
sum would not be a problem because "[LAND] has a $6,000 immediately
situation he has to deal with." This statement, coupled with
GROSS's prior statement about brokering a loan for LAND, as well as
public filings reflecting various judgments and liens filed against
LAND's corporation, suggests that GROSS believed LAND's financial
problems would make him amenable to laundering significant sums of
cash.

101. After this call, GROSS began to recount other people
and businesses he had become familiar with, using money laundering
terminology. At one point, he said, "I knew some guys in the auto,
auto business. I still know them. Now the auto business is, um,
very well renowned as not only, you know, uh, [for] auto sales, but
also as a laundromat." GROSS then described a type of transaction
whereby the purchase of a $50,000 automobile could be used to
generate phony records to conceal some $10,000 in cash. At
approximately 11:30 a.m., the FBI U/C and GROSS joined GRUTTADAURIA
in the hotel lobby for breakfast. During this recorded meeting,
GROSS recounted for GRUTTADAURIA his previous discussion with the
FBI U/C about the disposition of the diamonds as well as the use of
LAND's restaurant to launder the proceeds of diamond sales. GROSS
stated that "my buddy at the restaurant is looking forward to some

53

party planning. * * * We can get it started today; let us know who to make the checks out to." GRUTTADAURIA suggested that the checks be written in amounts payable below $10,000.

102. After breakfast, the FBI U/C, GRUTTADAURIA and GROSS drove to Cafe by the Sea to meet with LAND. The four then discussed using LAND's restaurant to launder cash from the FBI U/C. By the conclusion of the discussion, LAND agreed to do this for a fee of 16 percent of the amount laundered. Before the meeting broke up, GRUTTADAURIA, GROSS and the FBI U/C again spoke about disposing of the diamonds through "Jesse the jeweler." GROSS stated that "the idea is that you'll be dealing with him on a regular basis" and therefore "Jesse" could be trusted to give the FBI U/C the highest price for the diamonds. As the men left the restaurant, the FBI U/C handed GROSS $500 in cash as a finder's fee for locating an outlet to launder funds. GROSS accepted the money and thanked the FBI U/C. GROSS also provided the FBI U/C with a slip of paper with the name and telephone number for "Jesse the jeweler."

103. After GROSS departed, the FBI U/C and GRUTTADAURIA drove to the Java Room and met with RUTIGLIANO and another individual. Once there, GRUTTADAURIA stated that he would bring the diamonds to a different jeweler, whom he identified by first name and whose identity became known to me. Although GRUTTADAURIA did not allow the FBI U/C to accompany him to this meeting,

GRUTTADAURIA took the diamonds and returned several hours later, stating that his jeweler ("GRUTTADAURIA's jeweler") would dispose of the diamonds for $15,000.  The FBI U/C insisted he would not take less than $20,000 at which point the two arrived upon an agreed sale.[9]  GRUTTADAURIA and the FBI U/C also agreed that GRUTTADAURIA would receive one-third of the total sale price for the diamonds as his cut for finding a source willing to dispose of the "stolen" items.  The FBI U/C also provided GRUTTADAURIA with $2,500 in cash as partial payment for his share of the proceeds of the sale.  Thereafter, the FBI U/C and GRUTTADAURIA remained at the Java Room to have dinner with RUTIGLIANO and PECORARO.  During this time, the FBI U/C observed patrons using the illegal gambling room in the back of the restaurant before GRUTTADAURIA and the FBI U/C returned to the Garden City Hotel.

104. Between approximately 8:50 p.m., on the evening of January 29 and 1:30 a.m. of January 30, the FBI U/C, GRUTTADAURIA and LAND met again at the Garden City Hotel.  During this meeting, the FBI U/C handed LAND $15,000 in U.S. currency.  In exchange, LAND provided the FBI U/C with a false contract and receipt for services rendered in the catering of a party at Cafe by the Sea, as

---

[9] The diamonds in question were appraised before this undercover operation to be worth approximately $50,000 based on size and quality. The significant discount was agreed to by the FBI U/C consistent with his representations that ownership of the diamonds could not be established and therefore could not be sold in the open market as legitimate merchandise.

well as four checks drawn on a Cafe by the Sea account totaling
$12,600, representing the $15,000 less a 16% laundering fee as
agreed.  The checks were made payable to names provided by the FBI
U/C and were all post-dated to February 1, 2005 or February 10,
2005.  In discussing the 16 percent fee, LAND stated that "the
judge's cut" was more than five percent.

106. At approximately 7:15 a.m., GROSS called the FBI U/C
to find out whether he was able to reach "Jesse the jeweler".  The
FBI U/C indicated that he had instead arranged to dispose of the
diamonds through GRUTTADAURIA's jeweler.  GROSS responded by asking
the FBI U/C to keep "Jesse" in mind for future transactions
involving diamonds.

106. On January 31, 2005, the FBI U/C met GRUTTADAURIA's
jeweler at his place of business in Manhattan.  GRUTTADAURIA's
jeweler paid the FBI U/C $20,000 in cash for the diamonds.

107. On February 4, 2005, the FBI U/C spoke with GROSS
and explained that he would be traveling to Europe shortly to "look
at more stones."  The FBI U/C further represented that before
heading to Europe he would like to stop in New York "and then this
way I also have another, ahh, party I'm able to plan over, ah, at
the restaurant, ya know?"  GROSS indicated that he understood,
adding, "that'd be great."

### ii.  The Second Money Laundering Transaction

108. On February 7, 2005, the FBI U/C spoke with

GRUTTADAURIA and reiterated, in substance, the same representations made to GROSS, stating at one point, "I talked to that guy Dave. .. I wanted to drop off some more, ah, money with, ah, Brady and I wanted to know if you wanted to come up for the weekend." GRUTTADAURIA told the FBI U/C that he should proceed with the meeting and transactions with GROSS and LAND without GRUTTADAURIA being present.

109. On February 12, 2005, the FBI U/C met with GRUTTADAURIA in Sarasota, Florida. During this meeting, the FBI U/C paid GRUTTADAURIA the balance of his share in the sale of the diamonds through GRUTTADAURIA's jeweler. The FBI U/C also indicated that he planned to launder an additional $25,000 through GROSS and LAND on his next trip to New York, and agreed that GRUTTADAURIA would receive a 5 percent fee for every dollar laundered through these associates.

110. On February 25, 2005, the FBI U/C met with GROSS in a room at the Garden City Hotel. The meeting was captured in video and audio recordings. Initially, the FBI U/C presented GROSS with ten checks with no payee listed on them in amounts of $1,000 each. Referring back to GROSS's January 29 proposal as to how he could use his election campaign fund to launder some amounts of cash by claiming deposits were campaign contributions and withdrawals were payments for consulting work, the FBI U/C explained that he hoped these could be deposited and that GROSS could then return $8,000 in

"washed" money less GROSS's 20 percent commission.  GROSS thanked

the FBI U/C and then stated he had to think about "how to do this."

Ultimately, GROSS agreed to accept the checks.  At this point, the

FBI U/C handed GROSS an additional $5,000 in cash, to be used as an

actual campaign contribution, which the FBI U/C said was in thanks

for GROSS's efforts in introducing him to LAND.  Finally, the FBI

U/C informed GROSS that one of the checks that LAND gave him in

January had bounced when it was presented for payment.  The

following conversation then took place:

> GROSS:     Let me call BRADY right now and make sure this is--
>
> FBI U/C:   Because I had other money to give him this time,
>            you know.
>
> GROSS:     He's such a fuck up. Let me call him.
>
> FBI U/C:   Because what NICK is going to say is don't even
>            fucking use this guy.
>
> GROSS:     No definitely. I mean --
>
> FBI U/C:   And that hurts all of us.
>
> GROSS:     Right.
>
> FBI U/C:   And I like BRADY and want to work with him.
>
> GROSS:     I spoke to him this morning. He said everything is
>            fine, no problem.
>
> FBI U/C:   Did he not realize that one of his checks had
>            bounced.
>
> GROSS:     If he did, he didn't indicate it to me, which
>            pisses me off even more.

111. At this point in the conversation, GROSS used his

mobile telephone to call LAND.  Once he reached LAND, the FBI U/C

overheard GROSS say: "Yeah, BRADY. Listen buddy, I'm sitting here with a friend of ours and I'm looking at a 'Sealand Cafe, comma, Inc, period' check with a big red ugly NSF stamped on it. [Pauses and listens to other party] That's, uh, for two thousand dollars. [Pauses]. This is check number 1197. [Pauses] Yeah. [Pause]. All right, we'll probably head down there in a little while. We want to straighten this all out before Nicky G's plane lands at Kennedy." Public records, as well as other evidence obtained in this matter, reveal that Cafe by the Sea's corporate parent is a New York corporation named Sealand Cafe, Inc. The initials "NSF," which was stamped on the check provided to the FBI U/C by LAND, indicate insufficient funds.

112. After GROSS hung up with LAND, the following conversation took place:

FBI U/C:   I mean, you understand what I'm saying. I want to, by the time NICK comes --

GROSS:     I want this worked out. Oh yeah.

FBI U/C:   Yeah, you know NICK.

GROSS:     I just told him. I said, I warned BRADY, you can't fuck this up.

113. GROSS and the FBI U/C then drove to Cafe by the Sea, where LAND replaced the bounced $2,000 check. After this, GROSS took possession of all funds to be laundered for the FBI U/C, and insisted that he would give LAND small portions of cash in several installments.

114. Later on February 25, 2005, when GRUTTADAURIA joined GROSS, the FBI U/C and others, GRUTTADAURIA decided that only LAND's restaurant would be used to launder funds rather than GROSS's campaign fund account.    Subsequently, LAND joined this meeting, at which time GROSS gave LAND the ten checks payable in the amount of $1,000 each as well as $20,000 in cash all of which in various conversations and through the use of figures of speech such as "excess" and "untraceable" by the FBI U/C represented to be the proceeds from the sale of stolen diamonds.    Of this $30,000 total, it was agreed that LAND, per the plan developed by GROSS, would deposit the cash into his restaurant's corporate account and return these funds, less a 15 percent fee, to the FBI U/C in the form of a series of checks payable to third parties.    LAND also provided the FBI U/C with another false receipt for a catered event that would serve as cover for the exchange of funds.

115. Between March 10, 2005 and March 22, 2005, the FBI U/C received from LAND two cashiers checks and checks drawn on a corporate account totaling $25,500.    This was the net return on the $30,000 in checks and cash provided on February 25, 2005, less the revised 15 percent laundering fee that had been agreed upon by LAND, GRUTTADAURIA and GROSS.    During this period, LAND bounced a second check for $6,500, which he ultimately replaced by means of a wire transfer of funds from New York to the FBI U/C's account in another state on May 2, 2005.

### iii. **The Third Money Laundering Transaction**

116. At a subsequent meeting at Cafe by the Sea, also on
April 1, the FBI U/C gave GROSS $15,000 in cash. GROSS then took
the cash to LAND's office inside the restaurant, and  returned a
short time later with two checks for $6,750 each.   This total
amount was in fact $750 more than anticipated, given that LAND was
to have deducted 15 percent from the $15,000 in cash then being
laundered.  In addition, the FBI U/C gave GROSS an additional $500
in cash as a reward for having arranged the money laundering deal
with LAND.

### iv. **LAND's Separate Laundering Transaction**

117. On April 1, 2005, LAND met with the FBI U/C for a
second time.  This meeting took place inside the FBI's U/C room at
the Garden City Hotel.  During this meeting, LAND stated that he
was not making enough money in the laundering scheme with the FBI
U/C, stating that after GROSS and GRUTTADAURIA received their share
of the commissions, the amount LAND was left with in profit did not
justify the risk.  LAND indicated that he had said this to GROSS,
but that GROSS insisted that LAND continue with the scheme because
he expected that the sums of money laundered would get larger and
"we'll all make money."  LAND then asked the FBI U/C for a loan to
satisfy the financial difficulties LAND admitted he was having with
the restaurant.  The FBI U/C suggested instead that he would be
willing to launder additional funds through LAND for the same

commission, but without GRUTTADAURIA or GROSS's knowledge. Accordingly, LAND would realize the entire 15 percent of any sums laundered rather than having to share that commission with GRUTTADAURIA and GROSS. LAND thanked the FBI U/C for this offer and agreed that he would transact these additional funds, an receive his own fee for doing so, without informing GRUTTADAURIA or GROSS.

### v.   GROSS's Sale of Watches and Diamonds

118. On April 1, 2005, at the Garden City Hotel, the FBI U/C offered GROSS 24 diamonds, for sale through GROSS's jeweler contact. GROSS agreed to the arrangement. The FBI U/C represented the diamonds to be possessed unlawfully, and they were presented in three separate envelopes. The FBI U/C also gave GROSS ten watches and asked that GROSS attempt to dispose of them. GROSS took the diamonds and watches and agreed to try to dispose of them through an acquaintance of his who was a jeweler.

119. On April 5, 2005, GROSS called the FBI U/C about his efforts to dispose of the watches:

> GROSS: He ["Jesse the jeweler"] said Omega and Rolex are the way to go.
>
> FBI U/C: Well Dave, you know its supply and demand, those things are much harder to get on this kind of market.
>
> GROSS: I guess that's why the market's better for them.
>
> FBI U/C: The Rolex's, they come stamped and stuff, so that's a really risky proposition too.  These are un-stamped.  We have a really good contact to get them

out before they get stamped and stuff, so that's what makes them attractive for this kind of market.

GROSS:     BRADY called me up the other day and he goes, "I think I gave [the FBI U/C] too much money."

FBI U/C:   Oh, on the checks you mean?

GROSS:     Yeah.  And I looked at it and he was right.  He took out 10 percent instead of 15 percent.

FBI U/C:   Oh, I see, OK.

GROSS:     He left you $750 too much.

FBI U/C:   $700, OK, he left me $750 short on the first one but he did make that up so that's kind of funny.

                          * * *

FBI U/C:   I haven't talked to Nick in a couple of days about all this stuff, have you told him anything, or...

GROSS:     I told him, I told him about the cash.  I told him it was taken care of.  I mentioned absolutely nothing to anybody about the stones just like I told you.

FBI U/C:   All right, good.

GROSS:     He'll get jealous about it if he knew about it.  I told you that.

FBI U/C:   Yeah right.  Sounds good.

GROSS:     That's between you and I.

        120. On April 7, 2005, GROSS and the FBI U/C spoke over the telephone about the disposition of the 24 diamonds previously given to GROSS.  GROSS stated that his buyer was only willing to pay $5,400 for the diamonds.  This was significantly less than the true market value of the gems, which were independently appraised for the FBI at over $12,000.  Although the lower price offered was

consistent with the nature of sales in stolen jewelry, the FBI U/C
insisted on a higher return, representing to GROSS that the
diamonds were "untraceable" and therefore posed less risk to all
involved in their disposition.  Consequently, the FBI U/C demanded
a higher price for this merchandise.

121. On April 20, 2005, GROSS called to inform the FBI
U/C he sold the diamonds for $7,500.

122. On May 1, 2005, at approximately 6:29 p.m., GROSS
called the FBI U/C.  In this conversation, GROSS asked the FBI U/C
whether he had received a package in the mail.  The FBI U/C said he
had just returned to town and was not sure, but that an associate
might have signed for the package.  The following conversation then
took place:

GROSS:      All right, well, do me a favor and check to see
            that they got it, because, uh, it was, it wasn't a
            check.

FBI U/C:    What's that?

GROSS:      It was not a check.

FBI U/C:    What do you mean it was not a check.

GROSS:      It was not a check.  I couldn't, it was impossible
            to get checks.

Later that day, the FBI U/C received by mail at an address outside
of New York State, $7,500 in cash in an envelope bearing Cafe by
the Sea's return address.

### vi.  Third Money Laundering Transaction

123. In or about June and July 2005, CS-3, who posed as

an associate of the FBI U/C's in the trafficking of stolen
merchandise, arranged to meet with GROSS and LAND on July 20, 2005.
The purpose of this meeting was for GROSS and LAND to receive cash
that was represented to be the proceeds of the FBI U/C's illegal
activity, and which was to be laundered over a period of time
through LAND's Cafe by the Sea restaurant.   Pursuant to earlier
conversations with the FBI U/C, GROSS agreed that an additional
$70,000 would be laundered through LAND by means of creating a
phony paper trail that indicated that the source of the $70,000 in
cash would be a campaign fund raising party for GROSS that was
catered by LAND.   At the meeting with CS-3, as observed by an FBI
special agent, GROSS and LAND accepted $70,000 in cash from CS-3.
In exchange, LAND gave CS-3 a check representing the return of the
first $10,000 of the total $70,000 to be laundered, less a
transaction fee.   GROSS and LAND agreed to launder the remaining
cash in a series of subsequent transactions in groups of $10,000.
In addition, CS-3 also gave GROSS $1,000 in cash for his efforts in
arranging this transaction.

124. On July 20, 2005, the Honorable Joanna Seybert,
United States District Judge, authorized the interception of wire
communications over GROSS's cellular telephone.   Monitoring and
interception of calls pursuant to Court-authorization continued
through midnight, August 18, 2005.

125. On July 22, 2005, at approximately 7:54 p.m., GROSS

and the FBI U/C spoke over the telephone, at which time GROSS stated that the meeting with CS-3 had gone well. The two also discussed future plans to launder additional funds as well as possibly using GROSS's contacts to dispose of other "stuff," which GROSS understood to be jewelry by virtue of his reference to "Jesse the jeweler". As the conversation continued, the following exchange took place regarding the planned laundering of funds in the near future:

> FBI U/C:   All right, so what I'll do is call BRADY and then, uh, and then once I confirm with him, I'll let you know, just probably drop off twenty next time.
>
> GROSS:   Okay.
>
> FBI U/C:   And, ah, by the way, I'm, I ah, I just called Nick and left him a voice mail, so I'm gonna let him know that my cousin was up here just so he know.
>
> GROSS:   Okay. Are you gonna tell 'em, the amount?
>
> FBI U/C:   Um, yeah, I, I guess I probably should. I mean, whattya think?
>
> GROSS:   Up to you. However you wanna work it. It's your thing.

Toward the end of this conversation, GROSS agreed that he would tell "Nick" that he received "seventy" from the FBI U/C in reference to the $70,000, rather than a smaller figure because GROSS expressed concern that "Nick" might find out later that, in substance, GROSS had cheated GRUTTADAURIA out of his share of the laundering proceeds.

125. At approximately 8:42 p.m., also on July 22, GROSS

was intercepted calling GRUTTADAURIA.  After telling GRUTTADAURIA
that he had met with the FBI U/C's associate, GROSS informed
GRUTTADAURIA that LAND had recently purchased a houseboat for the
purpose of holding catered events and that the FBI U/C had reserved
the first party for "seventy," a reference to $70,000.  The
following conversation then took place:

GROSS:          So, so anyway, I have a package for you.

GRUTTADAURIA:   Right.

GROSS:          Well, you know, which is, you know, I'll, I'll
                hold onto it for you, and when I see you next
                I'll give it to ya.

GRUTTADAURIA:   Right, yeah.  I can have a, I'll have my
                friend Joe come by, ya know, he'll ah, 'cause
                he's coming down here like soon.

GROSS:          All right, well, you know, what we're doing
                is, we're doing a little bit at a time.

GRUTTADAURIA:   Right, okay. Well then I'll wait, I'll wait
                awhile until, you know --

GROSS:          Until it's worth something.

GRUTTADAURIA:   Yeah, that's all.

GROSS:          Right.  Okay. I'll let you know.

GRUTTADAURIA:   Yeah, let me know.

GROSS:          I'll keep you abreast, I just, my job is is to
                make sure that Brady doesn't fuck things up.

As the call continued, GRUTTADAURIA indicated that he had received
a message from the FBI U/C and that he would be calling him back
soon.

126. On July 23, 2005, GROSS was intercepted calling

"Jesse the jeweler".   GROSS informed him that his "friend" was coming back to New York soon, and would have additional jewels. GROSS and "Jesse" then discussed plans to dispose of this merchandise.

127. On July 29, 2005, the FBI U/C contacted GROSS and the two discussed a planned meeting with "Jesse the jeweler" to dispose of a diamond and opal necklace the FBI U/C would provide. In the conversation, GROSS asked the FBI U/C about the quantity of stones involved in the jewelry. The FBI U/C informed GROSS that he didn't know the quantity of stones but that the piece consisted of opal and diamonds and was worth $200,000.  The FBI U/C added that the more they got for the sale of this piece the more they could "share."  GROSS suggested that "Jesse the jeweler" would need to look at the piece.  In this conversation, GROSS also reported that he had witnessed LAND make out the third check and that LAND reported to GROSS that he had previously forwarded the second check related to the $70,000 transaction set forth above.

128. On August 1, 2005, GROSS spoke with "Jesse the jeweler" over the telephone and discussed the planned meeting with the FBI U/C to examine the jewelry to be provided by the FBI U/C. "Jesse" told GROSS that he would secure a diamond scale and loop, a reference to a magnifying device used to examine diamonds.

129. In a second conversation on August 1, 2005, GROSS and LAND discussed LAND's fee for the transaction he was

undertaking and whether LAND's fee was greater than the amount of taxes owed on the funds LAND was accounting for as receipts of the restaurant business. At one point in the conversation, in a clear reference to tax evasion, GROSS said to LAND, "Hopefully, you're not declaring all that shit." LAND responded that he had to declare the deposits into his corporate account as income, to which GROSS responded, "except for the part that's going into your back pocket." LAND insisted that even holding aside the "eighty-five hundred" (i.e., the amount of money returned to the FBI U/C in the form of business checks covered expenses for each $10,000 laundered), LAND did not believe these transactions were profitable. GROSS said he understood that they had to "make it worth your while," and that the FBI U/C would be in town within a few days.

130. On August 2, 2005, the FBI U/C met with GROSS in New York. During part of that meeting, GROSS went to his personal vehicle, a 1999 Chrysler 300M, bearing a New York license plate number and insignia identifying the vehicle as one driven by a New York State judge. GROSS opened the trunk of that car to retrieve a copy of a book GROSS had authored entitled If the Robes Fit. . . . GROSS indicated that he wanted to give a copy of the book to the FBI U/C as thanks for the fees he had obtained during the money laundering operation. While GROSS autographed the book, with the note, "Thanks for being my friend, David Gross," the FBI U/C

observed within the trunk of the vehicle the package within which

the $70,000 originally given to GROSS by CS-3 had been contained.

GROSS then confirmed that there remained approximately $40,000

inside the package, which he had not yet given to LAND.    GROSS

further stated that this location was, in his opinion, very secure

because the vehicle displayed a New York State license plate

indicating that the vehicle belonged to a state judge and would

therefore not likely be pulled over by the police.

131. On August 3, 2005, at approximately 1:36 p.m., GROSS

spoke with GRUTTADAURIA.    GRUTTADAURIA reported that he had

discussed with the FBI U/C raising LAND's fee for laundering funds.

GRUTTADAURIA said that the FBI U/C was concerned about the changing

terms of the arrangement, adding "I said, 'You're right about

that." Nevertheless, GRUTTADAURIA said that he explained to the FBI

U/C that, "You [GROSS] just misunderstood his [LAND's] expenses in

doing the party."  GRUTTADAURIA then advised GROSS, "It's up to

you.  Compromise a little, if you still want to do more parties.

If that's your intention and he can help you out, maybe, if you

want to help [LAND] out a little, do him a favor, give him a couple

of extra dollars and see. He's willing to do that."  The following

exchange then took place:

GROSS:       He is?  He's trying to come up a few points?

GRUTTADAURIA: Yeah. . . it makes sense if you have a long
             term plan, when you go to the next level, it
             won't change, that'll be solid and that's it.

GROSS:          Right.

GRUTTADAURIA:   So, . . . [the FBI U/C] is willing to go up a
                but, but make it seem like you guys are
                compromising.

GROSS:          Right.

                        * * *

GRUTTADAURIA:   When you go to the next level, BRADY can't
                change in the middle anymore.

GROSS:          Right, okay, sounds good.   Thanks a lot for
                getting back to me on that.

132. As the conversation continued, GROSS and GRUTTADAURIA also discussed the proposed plan to sell the jewelry being offered by the FBI U/C.  GROSS told GRUTTADAURIA that the FBI U/C's valuation of the jewelry piece "don't necessarily mesh with anyone else's."  GROSS continued that his jeweler offered about 80 percent of the price that the FBI U/C wanted.  However, GROSS then explained that the jewelry's piece had to be related by the piece's "provenance."  Nevertheless, GROSS said he would continue working on trying to get the jewelry sold.

133. Thus, GROSS, GRUTTADAURIA and LAND have jointly taken possession of $130,000 in cash, which they believe to be the proceeds of the FBI U/C's sale of stolen jewelry, and which they have laundered or agreed to launder by means described above.To date, a portion of the $70,000 provided to GROSS and LAND by CS-3 has not been returned to the FBI U/C.  At the time of this filing, GROSS remains willing to continue the money laundering scheme

71

should the FBI U/C provide additional sums of cash to be provided by the FBI U/C.

WHEREFORE, I respectfully request that an arrest warrants be issued for the defendants NICHOLAS MICHAEL GRUTTADAURIA, also known as "Beaver" and "Nicky G.," RONALD PECORARO, also known as "Ronald Russo" and "Frank Pecoraro," JOSEPH RUTIGLIANO, also known as "Joe Box" and "Joe New York," DAVID A. GROSS, KIM BRADY LAND, MUSTAFA KAHRAMAN, also known as "Mike," NEDIM SIRIN, MEHMET SAP, also known as "Metim," BIROL METE, also known as "Billy Boy," MECIT SAHIN, also known as "John," MICHAEL COSTIGLIOLA, GIOVANNI VELLA, also known as "Mousey," JOHN CAVALLO, also known as "Jack," SALVATORE RUBINO and SALVATORE CESARINO, so that they may be dealt with according to law.

Thomas R. Holmes, SA, FBI
THOMAS R. HOLMES,
Special Agent
Federal Bureau of Investigation


Sworn to before me this
26th day of August, 2005


E HONORABLE JO NA SEYBERT
UNITED STATES D TRICT JUDGE
EASTERN DISTRICT OF NEW YORK