

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JA:JMM:jmm
F.#2003R00558
bail letter

*United States Attorney's Office*

*610 Federal Plaza*

*Central Islip, New York  11722-4454*

August 1, 2005

The Honorable Arlene R. Lindsay
United States Magistrate Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:  United States v. Pecoraro & Rutigliano et al.
           Docket No. 05-1109

Dear Judge Lindsay:

     This letter is respectfully submitted in support of the government's request for a permanent order of detention on the grounds that the above-named defendants in this matter constitute dangers for which no combination of conditions of release might protect the community.

     The defendants PECORARO and RUTIGLIANO were arrested on August 30, 2005, pursuant to a criminal complaint charging them with, among other things, extortion and obstruction of justice in violation of 18 U.S.C. §§ 1951(a) and 1512(b)(3).  A temporary order of detention was entered and a detention hearing is scheduled for Friday, September 2, 2005 at 10 a.m.

## The Statutory Scheme for Detention

     Section 3142 of Title 18, United States Code sets forth the procedures, presumptions and standards for determining pre-trial detention.  The Court is authorized, upon motion of the Government in a case involving "a crime of violence"[1] to hold a hearing to determine:

---

[1] A crime of violence is defined as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or any other felony offense that involves "a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  18 U.S.C. §16.  The government submits that extortion and obstruction fall within this definition.

>     whether any condition or combination of conditions set
>     forth in subsection (c) of this section will reasonably
>     assure the appearance of the person as required and the
>     safety of any other person and the community.

18 U.S.C. § 3142(f)(1)(A). At such a hearing, the Court may consider, among other factors part, "the available information concerning":

>     (1)  The nature and circumstances of the offense
>          charged, including whether the offense is a crime
>          of violence;
>
>     (2)  the weight of the evidence against the person;
>
>     (3)  the history and characteristics of the person,
>          including--
>
>          (A) the person's character, physical and mental
>          condition, family ties, employment, financial resources,
>          length of residence in the community, community ties,
>          past conduct, . . . ; and
>
>     (4)  the nature and seriousness of the danger to any person or
>          the community that would be posed by the person's
>          release. In considering the conditions of release
>          [regarding execution of an agreement to forfeit property
>          or a bail bond with solvent sureties], the judicial
>          office may upon [her] own motion, or shall upon the
>          motion of the Government, conduct an inquiry into the
>          source of the property to be designated for potential
>          forfeiture or offered as collateral to secure a bond and
>          shall decline to accept the designation, or use of
>          collateral, of property that, because of its source, will
>          not reasonably assure the appearance of the person as
>          required.

18 U.S.C. §3142(g).

To order detention, the court must find, after a hearing, that the government has established the defendant's dangerousness by clear and convincing evidence. See 18 U.S.C. § 3142(f). The rules of evidence, however, do not apply in a detention hearing. See id.

In United States v. Martir, 782 F.2d 1141, 1144-45 (2d Cir. 1986), the Court of Appeals held that the government as well as the defendant should be able to proceed by way of proffers

rather than full-blown evidentiary hearings. Id., at 1145; See also United States v. Colombo, 777 F.2d 96 (2d Cir. 1985) (reversing district court and ordering defendant detained on basis of proffer). Every other circuit to have considered the matter has also rejected claims that the government is required to present live testimony in support of applications for detention. United States v., Smith, 79 F.3d 1208, (D.C. Cir. 1996); United States v. Gaviria, 828 F.2d 667, 669 (11th Cir.1987); United States v. Winsor, 785 F.2d 755, 756 (9th Cir.1986); United States v. Acevedo-Ramos, 755 F.2d 203, 206-07 (1st Cir.1985). See also United States v. Salerno, 481 U.S. 739, 743 (1987) (government relied on lengthy proffer derived from electronic surveillance and anticipated testimony for pretrial detention hearing)

In affirming the propriety of proceeding by way of proffer at a detention hearing, the Martir Court stated:

> While the Act is silent concerning how the government is to proceed at a detention hearing, the thrust of the legislation is to encourage informal methods of proof. Congress did not want detention hearings to resemble mini-trials.

Id., at 1144-45. See also United States v. Hurtado, 779 F.2d 1467, 1479 (11th Cir.1985) (purpose of pretrial detention hearing is not to "rehash ... probable cause" but to provide opportunity for detainee to show no risk of flight or danger to community); United States v. Williams, 798 F.Supp. 34, 36 (D.D.C.1992) (same).

## Factual Summary and Proffer

The defendants' arrests are the culmination of a two and one-half year investigation by the Federal Bureau of Investigation ("FBI") into racketeering activities of the defendants RUTIGLIANO and PECORARO, among others, who are alleged to be associates of the Genovese organized crime family of La Cosa Nostra ("LCN"). As alleged in the affidavit of FBI Special Agent Thomas Holmes, (hereinafter "Affidavit"), within their LCN association, the defendants operated a network of gambling locations across Long Island, engaged in money laundering and enforced discipline among two co-defendants through extortion and obstruction of justice.

As set forth the Affidavit, PECORARO and RUTIGLIANO managed, financed and supervised a gambling location inside a Turkish social club in Bay Shore, New York, that was run on a day-to-day basis by co-defendants BIROL METE, also known as "Billy Boy," and MECIT SAHIN, also known as "John." Affidavit at ¶¶ 70 to 85.

4

Beginning in late December 2003, according to intercepted telephone calls, METE began arguing with RUTIGLIANO and PECORARO over, among other things, METE's intention to remove RUTIGLIANO and PECORARO's gambling machines from the club and replace them with other machines, the profits from which METE and SAHIN would not have to share.

In a series of intercepted calls beginning on December 16, 2003, PECORARO and RUTIGLIANO threatened METE and SAHIN with violence should they carry out METE's threat to remove PECORARO and RUTIGLIANO's video gambling machines from the Bay Shore club. In one of the earliest such call, the following was recorded:

>     RUTIGLIANO:     Why are you doing this?  What's the reason?
>
>     METE:           I'm tired of losing my own money.
>
>     RUTIGLIANO:     So you wanna pull a prank on me and RONNIE?  What did we do to deserve this?
>
>     METE:           You wanna kill me, I'm right here, kill me. You threaten me the other day, you come here with the fucking army.  You wanna kill me, listen, I'm right here.
>
>     RUTIGLIANO:     You're outta line; you don't fool people like this.
>
>     METE:           I have one life left.  You wanna kill me, I have one life left.  I don't want the machines anymore.  I don't want to bring in other machines.
>
>     RUTIGLIANO:     Okay.  You put a machine in there, I'm going to burn the motherfucker to the ground, I swear on my kids.  You have no idea.  You want them out, I'll take them out.  Don't fuck with me.

The discussion ended with RUTIGLIANO screaming much of the following:

> You got a big fucking mouth.  You know what happens to guys with big fuckin' mouths, they get in a lot of fucking trouble.  Here's my advice to you, you better calm down.  Tomorrow or the next day, I'll be taking those fuckers out, let me tell you something, on my kids, there better not be (screaming, unintelligible) . . . I'm

not threatening you, I'm threatening that fucking joint. You better have my twenty-five hundred, you understand?"

RUTIGLIANO and PECORARO were intercepted shortly thereafter discussing RUTIGLIANO's threat ("I told him I'll burn the place down if he puts [someone else's] machines in there.") and concern about an un-intercepted conversation in which METE threatened to "drop[] dimes" on RUTIGLIANO and PECORARO.

Soon thereafter, PECORARO reported to RUTIGLIANO his own conversation with METE's partner, co-defendant SAHIN, and was recorded saying he warned SAHIN that if METE put someone else's gambling machines in his club, "he's going to Good Sam's [i.e., Samaritan] hospital." PECORARO continued that when SAHIN told him to "calm down," he responded "'I'm not a nice guy. I did you favors, you think I'm an asshole? Tell that cocksucker I'll take the machines out of there, [and] if he puts one machine in there, he's going to the hospital. . ..'"

The dispute continued through January 2004. On January 2, 2004, RUTIGLIANO called PECORARO to discuss, among other things, his concern that their Turkish co-defendants and co-conspirators would be the first "to testify against you. They're weak."

On January 6, 2004, RUTIGLIANO and PECORARO were intercepted discussing a new round of threats against METE and SAHIN. In one call, RUTIGLIANO conveyed that METE was again threatening to remove the video gambling machines from his club, to which PECORARO responded that he was going to see METE immediately to "straighten him out" and that he would take along another person named Al.[2]

At approximately 4:16 p.m., on January 6th, RUTIGLIANO received a call from PECORARO, who reported that he "didn't get Billy but I saw John [SAHIN]. Al and I opened up his asshole four feet. * * * 'He's a friend of yours?' we told him, 'He's going to Good Sam hospital. He's taking a trip over there, [] he touches those machines or pulls those plugs out. You tell that cocksucker.'" PECORARO then discussed Al's size and the size of his hands. "He [Al] looks at you, it goes right through you, his eyes. Fucking John [SAHIN] had to clean out his underwear."

Aside from the charged conduct, evidence obtained during the August 30, 2005 arrest of PECORARO and RUTIGLIANO, the

---

[2] FBI special agents were dispatched to intervene, if necessary, in the event of actual violence.

government submits, also weighs in favor of detention.

### **PECORARO's Arrest**

PECORARO was arrested in his home by the FBI. During the execution of that warrant, the defendant orally consented to a search of his house. At one point, the defendant admitted that he possessed a handgun, which was eventually located by arresting agents, together with a loaded magazine nearby.

PECORARO has a prior felony conviction in the District of Connecticut arising from earlier racketeering-related activity; thus, his possession of a weapon is a violation of 18 U.S.C. § 922(g)(1). Moreover, upon closer inspection, FBI agents noted that the serial number on the weapon had been obliterated, making its possession a separate offense in violation of 18 U.S.C. § 922(k).

Following his arrest and during processing at the FBI offices in Melville, New York, PECORARO was orally advised of his rights pursuant to Miranda. He executed a written advise of right form declining to waive such rights. Subsequently, while being advised of the nature of the charges and the evidence gathered against him and others, during which agents repeatedly advised the defendant not to speak, PECORARO volunteered that he runs a "legitimate" vending machine business. In making this spontaneous defense, however, PECORARO admitted ownership of illegal electronic gambling machines on the grounds that these devices were necessary to supplement the income from or defray losses generated by his "legitimate" business.

### **RUTIGLIANO's Arrest**

At the time of his arrest, RUTIGLIANO was also orally advised of his rights, and similarly declined to waive those rights. Like his co-defendant PECORARO, however, after declining top speak, RUTIGLIANO spontaneously made admissions that the gambling devices were a necessary supplement to the vending machines business that he co-owns with PECORARO.

### **Discussion**

The evidence in this case generally, and as it pertains to the crimes of violence of extortion and obstruction, is very strong. The government will be prepared to play for the Court at the detention hearing, the intercepted calls excerpted above, in order for the Court to hear the screaming and threatening inflection of the defendants' voices. The interception of RUTIGLIANO, in particular, threatening METE as set forth above is

7

clearly more than boasting, but rather a message intended to threaten violence.

Moreover, PECORARO's possession of a weapon with an obliterated serial number, despite his prior felony conviction, the government believes, further weighs in favor of detention of that defendant.

Assuming both defendants seek to post property as collateral for a bail bond, their admissions at the time of arrest regarding the central role that their illegal gambling business plays in their finances, renders posting of their residences as collateral insufficient. More importantly, should the Court find the facts proffered here sufficient to support the government view that the defendant pose a danger to the community, the law is clear that bonds secured by cash or property cannot mitigate such a danger. "[T]he fact that [a defendant] must surrender his passport and post a bond tends merely to assure that he will not flee and does not relate to protection of the community." United States v. Colombo, 777 F.2d at 100; United States v. Ferranti, 66 F.3d 540, 543 (2d Cir. 1995)("$1,000,000 bond would have deterred flight, not danger").

For all the reasons set forth above, as well as any additional facts that the government may present at the scheduled detention hearing, the defendants should be held without bail pending trial.

Respectfully submitted,

ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY

By: _____
James Miskiewicz
Assistant U.S. Attorney

cc(by FAX):

Alan Nelson, Esq.
Leonard Sperber, Esq.